IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

**FILED**

MAR 0 6 2007

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY⎽⎽⎽⎽⎽⎽⎽⎽ DEPUTY CLERK

**A07 CA 164 SS**

| | |
|---|---|
| SAULE BUNIKYTE, by and through her next friend and mother, Rasa Bunikiene, | ) ) ) |
| Plaintiff | ) ) ) |
| v. | ) ) ) |
| MICHAEL CHERTOFF, Secretary of U.S. Department of Homeland Security (DHS); JULIE L. MYERS, Assistant Secretary, U.S. Immigration and Customs Enforcement (ICE); JOHN P. TORRES, Director, Office of Detention and Removal Operations, ICE; MARC MOORE, ICE Field Office Director; GARY MEAD, Assistant Director of Detention and Removal Operations at ICE, SIMONA COLON, ICE Officer in Charge; JOHN POGASH, ICE National Juvenile Coordinator, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action
No.:

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

## INTRODUCTION

1.      This is an action on behalf of a nine-year-old child, Saule Bunikyte, who has been

unlawfully imprisoned by U.S. Immigration and Customs Enforcement ("ICE"), part of the U.S.

Department of Homeland Security ("DHS"), for the past 82 days.  Saule is being held at a

converted medium-security prison, the T. Don Hutto Family Residential Center ("Hutto") in

Taylor, Texas, in violation of the Settlement Agreement in *Flores v. Meese*, No. 85-cv-4544

(C.D. Cal.) (hereinafter "*Flores* Settlement" or "Settlement").  The United States Department of

Justice entered into the *Flores* Settlement in January 1997, and ICE remains bound by the

Settlement today.  This action seeks to enforce the *Flores* Settlement on Saule's behalf, to secure

her release, and to ensure that she is not separated from her mother and her sister.

1

2.      The *Flores* Settlement established minimum standards and conditions for the
housing and release of all minors in federal immigration custody.  Recognizing the particular
vulnerability of children in detention, the Settlement regulates ICE's release and treatment of
minors in three fundamental areas: First, it contemplates that children will generally be released
promptly to their parents or designated family members, or, if necessary, to shelters and
unrelated custodians.  Second, those class members who remain in ICE's custody must be placed
in the least restrictive setting possible, generally a facility or home licensed for the care of
dependent, non-delinquent minors.  Third, regardless of where they are housed, detained minors
are guaranteed a range of basic educational, health, social, and other benefits and rights.

3.      Notwithstanding the Settlement, and despite wide recognition that for juveniles
"even the most minimal experience of incarceration [can be] extremely injurious," *Lanes v.
State*, 767 S.W.2d 789, 796 (Tex. Crim. App. 1989), defendants have been imprisoning minor
children at Hutto in clear violation of the Settlement.  ICE fails to consider these children for
release to their parents under reasonable conditions of supervision, fails to place them in the least
restrictive custodial setting, and fails to detain them in conditions that meet *Flores* standards.
As a result of defendants' refusal to comply with the dictates of *Flores*, the children detained at
Hutto suffer prolonged imprisonment, needless frustration, acute anxiety, fear and depression.

4.      Defendants' use of the Hutto facility to detain children and families also directly
contravenes the expressed intent of Congress.  In 2005 and 2006, Congress directed DHS to keep
immigrant families together, and either to release such families altogether or use alternatives to
detention. Congress noted that if detention is necessary, immigrant families should be housed in
non-penal, homelike environments. In 2005, the House Committee on Appropriations, when
making appropriations to DHS, directed, "The Committee expects DHS to release families or use

alternatives to detention such as the Intensive Supervision Appearance Program whenever possible." Department of Homeland Security Appropriations Bill, H.R. 79, 109th Cong. (2005). The following year, the House Committee on Appropriations, when making appropriations to DHS, reiterated its position that, where possible, family units should be released under conditions of supervision, and "if detention is necessary, [ICE should] house these families together in non-penal, homelike environments until the conclusion of their immigration proceedings." Department of Homeland Security Appropriations Bill, H.R. 476, 109th Cong. (2006). In 2007, Congress again reaffirmed this position. Department of Homeland Security Appropriations Bill, 2007, H.R. 476, 109th Cong., 2d Session (2007).

     5.     ICE has stated that it opened Hutto in May 2006 to keep families together, pursuant to Congress's recommendation. However, while ICE calls Hutto a "Family Residential Center," the facility itself used to be a medium-security prison and, until recently, razor wire surrounded much of its perimeter. Indeed, far from providing a "non-penal homelike environment[]," Hutto is structurally and functionally a prison. Children are required to wear prison garb. Until two weeks ago, they received only one hour of recreation a day, Monday through Friday, and were rarely allowed outdoors in the fresh air. Despite recent changes, they still do not receive the amount of recreation that thriving children require. They are detained in small cells for about 11 or 12 hours each day, prohibited from keeping food, writing implements, and toys in their cells, and hardly have any privacy. Moreover, despite their urgent needs, they lack access to adequate medical, dental, and mental health treatment, and are denied adequate educational opportunities. Guards frequently discipline children by threatening to separate them permanently from their parents, and children are prohibited from having contact visits with non-detained family members.

6.      There is no question that family unity is of paramount concern.  However, ICE's use of this objective to justify imprisoning immigrant children wholly perverts congressional intent.  As clearly recognized by Congress in its directive to DHS, the choice is not between enforcement of the immigration laws and humane treatment of immigrant families.  Rather, ICE has alternatives to detention that would satisfy both these objectives and be more cost-effective as well.  These include the Intensive Supervision Assistance Program ("ISAP"), a program that utilizes electronic monitoring as a way to supervise immigrants released into the community, and for which Congress *specifically allocated funding*.  Moreover, in the event that greater supervision is deemed necessary, there are "non-penal homelike environments" where such families can be held.  For example, the U.S. Marshals Service in San Diego has a contract with a 24-hour care facility run by Catholic Charities, Casa San Juan.  A similar facility, Casa Marianella, houses refugee families in Austin, Texas.  Either of these options could bring DHS into compliance with the *Flores* Settlement.

7.      There is simply no justification for imprisoning children, many of whom are seeking asylum and have been found by a trained asylum officer to possess a credible fear of persecution, in a converted medium-security prison that does not provide proper services or comport with existing federal standards on the detention of immigrant children.  Because defendants have failed to comply with their clear obligations under *Flores*, Saule seeks declaratory and injunctive relief to remedy the serious and ongoing violations of her rights.

### JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1346(a)(2).

4

9.    This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

10.    This Court has authority to grant injunctive relief in this action pursuant to 5 U.S.C. § 702, and Rule 65 of the Federal Rules of Civil Procedure.

11.    Venue properly lies in the Western District of Texas pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(2) because a substantial part of the events and omissions giving rise to Saule's claims occurred, and continues to occur, in this district.

## PARTIES

A.    **Plaintiff**

12.    Saule appears by and through her next friend and mother, Rasa Bunikiene. Rasa Bunikiene also is currently detained at Hutto with Saule.  Saule's sister, Egle Baubonyte, age sixteen, is also detained at Hutto.

13.    Saule was born on August 14, 1997 in Lithuania.  She arrived in the United States on March 8, 2005.  She was in the third grade at West Elementary in Crystal Lake, Illinois until December 15, 2006 when she was picked up by ICE with her sister and her mother and sent to Hutto.

14.    There has never been any suggestion that Saule or her mother or sister poses any danger that would require their detention.

15.    Saule has been detained at Hutto from December 15, 2006 to the present. She is in the custody of the defendant officials at DHS, under the direction of the Secretary of DHS, Michael Chertoff, and ICE, under the direction of Julie L. Myers, the Assistant Secretary of Homeland Security for ICE.

16.     Since arriving at Hutto, Saule has suffered and continues to suffer actual injury because defendants have failed to consider her for release, place her in the least restrictive setting, or provide her with essential rights and services.

**B.     Defendants**

17.     Defendant Michael Chertoff is the Secretary of DHS, the agency charged with enforcement of the nation's immigration laws. As such, Chertoff has ultimate authority over the administration and operation of all U.S. immigration laws, including the care and treatment of persons detained pursuant to those laws. Chertoff has ultimate control and oversight over all DHS employees, and is responsible for setting policy and establishing regulations for DHS. Chertoff is specifically authorized to allocate funds to provide necessary clothing, medical care, housing, and security for immigration detainees, and to enter into agreements necessary to establish acceptable conditions of confinement and detention services. *See inter alia* 8 U.S.C. § 1103; 6 U.S.C. §§ 112, 251 and 557. Chertoff is legally required to enforce and comply with all provisions of the *Flores* Settlement, a true and correct copy of which is attached as Exhibit A ("Ex. A").

18.     Defendant Julie L. Myers is Assistant Secretary for ICE, the arm of DHS charged with detaining and removing non-citizens pursuant to federal immigration law. As the top official at ICE, Myers sets detention and removal priorities and has ultimate responsibility for the safety and well-being of children detained in ICE custody. The Office of Detention and Removal Operations ("DRO"), a division of ICE, manages the daily detention of immigration detainees. Myers supervises the official conduct of all DRO officials and may appoint and remove subordinate defendants named herein. As Assistant Secretary (under Secretary Chertoff) in charge of immigration detention, Myers controls the allocation of monies in the DHS-ICE budget

6

for detention and removal operations and, specifically, the care and treatment of ICE detainees. Myers is legally required to enforce and comply with all provisions of the *Flores* Settlement.

19.    Defendant John P. Torres is the Director of DRO for ICE and is responsible for the safe, secure, and humane housing of immigration detainees in ICE custody. The primary responsibility of DRO is to provide adequate and appropriate custody management of immigration detainees until a decision is rendered regarding their removal. ICE-DRO headquarters staff conduct annual inspections of each facility used to house immigration detainees, and assess them for compliance with ICE Detention Standards. Torres oversees the DRO workforce, including ICE field officers, deportation officials, compliance review officers, and officers assigned to detention facilities. Torres is responsible for setting DRO policy with respect to the detention of foreign nationals, and for the administration and operation of DRO. Torres is legally required to enforce and comply with all provisions of the *Flores* Settlement.

20.    Defendant Gary Mead is the Assistant Director of DRO for ICE.  As such, he assists Torres in overseeing the DRO workforce, including ICE field officers, deportation officials, compliance review officers, and officers assigned to detention facilities. Mead also assists in setting and enforcing DRO policy with respect to the detention of foreign nationals, and for the administration and operation of DRO. Mead is legally required to enforce and comply with all provisions of the *Flores* Settlement.

21.    Defendant Marc Moore is the Director of the ICE San Antonio Field Office, which has jurisdiction over Hutto and official control over detention and removal operations at the facility. Moore oversees transfers of immigration detainees into and out of Hutto and formally approves all placements of detainees at Hutto. Moore supervises and oversees all ICE

staff at the San Antonio Field Office. Moore is legally required to enforce and comply with all provisions of the *Flores* Settlement.

22.     Defendant Simona Colon is the ICE Officer-in-Charge at Hutto. As the Officer-in-Charge at the facility, Colon is the immediate legal custodian of the ICE detainees at Hutto and is directly responsible for their care and treatment while in detention there. Colon has authority to transfer detainees into and out of the facility and supervises all ICE employees at Hutto. On information and belief, Colon also has significant oversight over the actions of Corrections Corporation of America, Inc. ("CCA") employees at Hutto, including the Warden, pursuant to the DHS-ICE contractual agreement with CCA to house immigration detainees at the facility. Colon is legally required to enforce and comply with all provisions of the *Flores* Settlement.

23.     Defendant John Pogash is the National Juvenile Coordinator for ICE. As the National Juvenile Coordinator, Pogash has direct authority over DHS field personnel in decisions relating to the proper handling of juveniles, including the placement of juveniles in DHS-funded facilities, the transfer of juveniles to other facilities, or their release from DHS custody. Pogash is legally required to enforce and comply with all provisions of the *Flores* Settlement and has numerous specific obligations under the Settlement, including the obligation to "monitor compliance with the terms of the Agreement" and the obligation to "collect information regarding the reasons for every placement of a minor in a detention facility or medium security facility." Ex. A, at ¶ 28(A).

24.     All defendants are sued in their official capacities.

25.    At all relevant times, all defendants were acting under color of federal law, pursuant to their authority as officials, agents, contractors, or employees of U.S. governmental agencies or entities.

## THE *FLORES* SETTLEMENT

26.    On January 28, 1997, the United States District Court for the Central District of California approved the Stipulated Settlement Agreement in *Flores v. Meese*, which established a "nationwide policy for the detention, release, and treatment of minors" in ICE's custody. [1] *See* Ex. A, at ¶ 9. The Settlement remains in effect today.

27.    The *Flores* Settlement was the result of years of litigation initiated by the Center for Human Rights & Constitutional Law, the National Center for Youth Law, and the law firm of Latham & Watkins, LLP.  The *Flores* certified class action began in 1985. On November 30, 1987, the federal district court for the Central District of California approved a settlement in which the Immigration and Naturalization Service ("INS") pledged to remedy the "deplorable conditions" affecting minors in its custody in the Western Region. *See* Memorandum of Understanding Re: Compromise of Class Action: Conditions of Confinement (Nov. 30, 1987) ("MOU").  Although the MOU nominally resolved the majority of plaintiffs' complaints over the treatment of minors in its custody, the INS refused to discontinue its practice of strip-searching minors when they were admitted or re-admitted to detention facilities or after visiting with relatives or counsel. In 1988, the Central District of California entered summary judgment in plaintiffs' favor specifically prohibiting defendants from strip-searching minors absent a

---

[1] Created in March 2003, ICE combines the law enforcement arms of the former INS and the former U.S. Customs Service. The *Flores* Settlement binds ICE, since ICE is the successor of the INS. Ex. A, at ¶ 1 ("The term 'party' or 'parties' shall apply to Defendants and Plaintiffs. As the term applies to Defendants, it shall include their . . . successors . . . .").

reasonable suspicion that strip-searching a particular juvenile could yield weapons or contraband. *Flores v. Meese*, 681 F. Supp. 665, 669 (C.D. Cal. 1988).

28.     As for defendants' release policy, in 1993 the U.S. Supreme Court reversed the *en banc* opinion of the Ninth Circuit Court of Appeals, which had affirmed the Central District of California's order requiring the INS to determine whether individual minors should be released to reputable caregivers in addition to their parents and guardians. The Supreme Court held that the INS had discretion to adopt a blanket policy against releasing minors to unrelated caregivers *if* the treatment and conditions children experienced in defendants' custody measured up to the requirements of the MOU. *Reno v. Flores*, 507 U.S. 292, 305 (1993).

29.     Upon remand from the Supreme Court, plaintiffs filed voluminous evidence showing that the INS was not, in fact, in compliance with the MOU. Rather than contest plaintiffs' evidence, defendants agreed to the terms of the Settlement, which was approved by the Central District of California in January 1997. The original termination provision of the 1997 *Flores* Settlement was modified by a December 2001 Stipulation and Order, which states: "All terms of this Agreement shall terminate 45 days following defendants' publication of final regulations implementing this Agreement.  Notwithstanding the foregoing, the INS shall continue to house the general population of minors in INS custody in facilities that are state-licensed for the care of dependent minors."  Defendants have never issued final regulations implementing the terms of the *Flores* Settlement, so the terms of the Settlement remain binding and enforceable.

30.     The certified class in *Flores* is defined as: "All minors who are detained in the legal custody of the INS."  Ex. A, at ¶ 10.  The Settlement defines the term "minor" as "any person under the age of eighteen (18) years who is detained in the legal custody of the INS." *Id.*

10

¶ 4.  Saule is a member of the *Flores* Class and is entitled to all the protections derived from the Settlement.

31.    Paragraph 24(B) of the *Flores* Settlement permits any minor who disagrees with her placement in a particular type of facility, or who asserts that the facility does not comply with the standards set forth in the Settlement to "seek judicial review in any United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1."

32.    Paragraph 24(C) of the *Flores* Settlement requires ICE to provide Saule with "a notice of the reasons for housing the minor in a detention or medium security facility." Ex. A, at ¶ 24(C). Defendants have never provided such a notice to her.

33.    Prior to initiating this action, Saule's attorneys sent letters on February 21 and March 1, 2007 providing notice of the violation of her rights at Hutto to the United States Attorney's office in the Western District of Texas in an effort to informally resolve the matter pursuant to paragraph 24(E) of the *Flores* Settlement. Ex. A, at ¶ 24(E). Neither the United States Attorney's office for the Western District of Texas nor the Office of Immigration Litigation, to which the letters were forwarded, has responded to the substance of the faxed letters from Saule's attorneys.

### FACTUAL ALLEGATIONS

34.    As of February 10, 2007, ICE was housing 400 immigration detainees at Hutto, approximately 200 of whom are children. A significant percentage of the families detained at Hutto are seeking asylum in the United States. Most of these families were found by a trained asylum officer to have a credible fear of persecution, and have pending asylum applications. The children at Hutto have committed no crimes and are being detained as a result of the actions of

11

one or both of their parents. Some of the children at Hutto will ultimately remain in the United States legally because the government will determine that they have not violated immigration laws or they qualify for asylum. Since the facility opened, families have been detained for periods of time ranging from a couple of weeks to over 200 days and counting.

35.    Saule is being detained at Hutto in violation of virtually every provision of the *Flores* Settlement. She brings this suit to enforce her rights pursuant to the *Flores* Settlement, to seek the release of her, her sister, and her mother from Hutto, and to ensure that she is not separated from her mother and her sister.

### A.    The ICE-CCA Partnership

36.    Hutto is a contract detention facility in Taylor, Texas operated by CCA. CCA is not in the business of running licensed child-care facilities; it is the largest private, for-profit provider of detention and corrections services for adults in the nation. On its website, the CCA's statement of vision reads: "To be the best full service *adult* corrections company in the United States" (emphasis added).

37.    ICE pays CCA over $2.8 million per month to run the Hutto facility for up to 512 detainees and an additional $79 per day for each detainee over 512. Despite this highly lucrative contract, children at Hutto receive inadequate services that fail to meet the requirements of the *Flores* Settlement.

### B.    Defendants' Violation of Policy Favoring Release

38.    The first fundamental obligation of the *Flores* Settlement is that ICE actively and continuously seek to release minors from its custody. Section VI of the Settlement ("General Policy Favoring Release") memorializes ICE's obligation to decrease the frequency and length of detention of minors, whenever possible. Stipulating that detention is generally detrimental to

minors, ICE has agreed to release a minor "without unnecessary delay" once it determines that "detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others." Ex. A, at ¶ 14. The Settlement makes clear that as a general matter, ICE must actively and continuously attempt to locate appropriate custodians for detained minors and release minors who have qualified custodians available to care for them: "Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody." Ex. A, at ¶ 18. The agreement also stipulates that detaining minors should be only a temporary solution. Ex. A, at ¶ 19. The Settlement provides that release to a parent is the highest priority preference among release options. Ex. A, at ¶ 14.

39.    Defendants have failed and continue to fail to consider Saule for release to and with her mother under reasonable conditions of supervision.   On information and belief, defendants have made no meaningful effort to explore or develop release alternatives to family detention.

40.    Defendants have failed and are continuing to fail to provide family reunification services designed to identify Saule's relatives in the United States.

### C.    Defendants' Violation of Requirement to Place Minors in the Least Restrictive Setting

41.    The Settlement's second fundamental obligation is that the limited number of minors who remain in ICE's custody must be placed in "the least restrictive setting appropriate to the minor's age and special needs…." Ex. A, at ¶ 11.   The Settlement allows ICE to transfer a minor to a secure lock-down, such as a juvenile hall, only when it can show that the child is

charged or chargeable with a delinquent act (except for isolated, non-violent, or petty offenses),

has committed or threatened to commit a violent act, has proven to be unacceptably disruptive of

a licensed program, is a serious "escape risk," or needs secure confinement for protection from

smugglers. Ex. A, at ¶ 21. Before resorting to secure confinement, however, ICE must, if

practicable, transfer the minor to another licensed program or to a "medium secure" youth

facility. Ex. A, at ¶ 23.

42.    Defendants have failed and are continuing to fail to place Saule in the least

restrictive setting appropriate to her age and needs. She has committed no delinquent acts, is not

a danger to herself or others, and has not been shown to be an escape risk. Indeed, Hutto is

among the *most* restrictive settings in which she could be detained. The Hutto facility is a prison

and is managed and operated by CCA employees trained to run adult correctional facilities. At

Hutto, Saule's freedom of movement and daily activities are entirely circumscribed. For

example, she is confined to a small cell for 11 to 12 hours a day, is permitted very limited

outdoor and recreation time, and must finish eating each meal in 20 minutes or less, or risk going

hungry.

**D.    Defendants' Failure to Provide the Essential Rights and Services**

43.    ICE's third fundamental obligation is to treat children in their custody "with

dignity, respect, and special concern for their vulnerability as minors." Ex. A, at ¶ 11.

Paragraphs 19, 6 and 24(B), and Exhibit 1 of the *Flores* Settlement, titled "Minimum Standards

for Licensed Programs," ("Ex. 1 to Ex. A"), accordingly guarantee children the following

benefits and services: (a) placement in a licensed facility; (b) individualized needs assessment;

(c) special needs assessment; (d) suitable living conditions; (e) suitable food; (f) right to wear

their own clothing; (g) appropriate medical care; (h) mental health care, counseling, acculturation

and adaptation services; (i) appropriate educational services; (j) adequate recreation and leisure;
(k) access to religious services; (l) contact visits with non-detained family members; (m) right to
privacy; and (n) disciplinary methods that do not have adverse psychological consequences. Ex.
1 to Ex. A; *see also* Ex. A, at ¶ 6 ("A licensed program must . . . meet those standards for
licensed programs set forth in Exhibit 1 . . . ."). Defendants have failed to provide Saule with
these essential rights and services.

(a)    Placement in Licensed Facility

44.    Hutto is not a licensed program within the meaning of the *Flores* Settlement. Ex.
A, at ¶ 6 (defining a licensed program as "any program, agency or organization that is licensed
by an appropriate State agency to provide residential, group, or foster care services for dependent
children, including a program operating group homes, foster homes, or facilities for special needs
minors. A licensed program must also meet those standards for licensed programs set forth in
Exhibit 1 attached hereto. . . ."). Defendants must provide a notice of reasons for housing a
minor in a detention or medium security facility. Ex. A, at ¶ 24(C).

45.    Defendants have failed and are continuing to fail to place Saule in a licensed
facility. Defendants have failed to provide a notice of reasons for housing Saule in a detention or
medium security facility.

(b)    Individualized Needs Assessment

46.    The *Flores* Settlement requires defendants to conduct an individualized needs
assessment for Saule. Ex. 1 to Ex. A, ¶ A(3). ("An individualized needs assessment . . . shall
include: (a) various initial intake forms; (b) essential data relating to the identification and
history of the minor and family; (c) identification of the minor's special needs including any
specific problem(s) which appear to require immediate intervention; (d) an educational

15

assessment and plan; (e) an assessment of family relationships and interaction with adults, peers

and authority figures; (f) a statement of religious preference and practice; (g) an assessment of

the minor's personal goals, strengths and weaknesses; and (h) identifying information regarding

immediate family members, other relatives, godparents or friends who may be residing in the

United States and may be able to assist in family reunification.").

47.    Defendants have failed and are continuing to fail to conduct an individualized

needs assessment for Saule.

(c)    Special Needs Assessment

48.    The *Flores* Settlement requires defendants to conduct a special needs assessment

for Saule. Paragraph 7 of the *Flores* Settlement requires, "The INS shall assess minors to

determine if they have special needs and if so, shall place such minors, whenever possible, in

licensed programs in which the INS places children without special needs, but which provide

services and treatment for such special needs." Ex. A, at ¶ 7; *see also* Ex. 1 to Ex. A, at ¶

A(3)(c).

49.    Defendants have failed and are continuing to fail to conduct a special needs

assessment for Saule.

(d)    Suitable Living Conditions

50.    The *Flores* Settlement requires defendants to provide Saule with "suitable living

conditions." Ex. 1 to Ex. A, at ¶ A(1).

51.    Defendants have failed and are continuing to fail to provide Saule with suitable

living accommodations. She is forced to live in a small cell with two bunk beds, a toilet, and a

sink. She must share this small space with her mother and her sister. Because there is no divider

separating the sleeping area from the toilet area, Saule is not afforded any privacy when using

the toilet. The bunk bed has a metal frame, and no padding to protect her from getting cut by its sharp edges. The mattress on the bed is exceedingly thin. The cell is often cold and damp with water leakage. The showers often have only cold water.

52.     Cell doors must remain open except during the "count" periods each day, including after "lights out." Although the cell doors are not locked during these times, the cell doors are closed. Laser sensors are tripped when a cell door opens more than four inches, which functionally confines Saule to the cell for a total of about 11 or 12 hours each day.

(e)     Suitable Food

53.     The *Flores* Settlement requires defendants to provide Saule with "suitable . . . food" and "special diets" if medical circumstances so require. Ex. 1 to Ex. A, at ¶¶ A(1), A(2).

54.     Defendants have failed and are continuing to fail to provide Saule with suitable food. The food often is inedible and consists of unrecognizable substances, mostly starches. Meat and fresh vegetables are rarely served. At many meals, Saule cannot bear to eat the food. She has had serious stomach pain following meals on a number of occasions. She is typically afforded 20 minutes to eat and sometimes only 5 minutes. On the occasions where she has attempted to eat the food, the guards have rushed her through meals and pushed her out of the cafeteria without allowing her to finish her food. Although Saule becomes hungry at times other than meal times, she is prohibited from taking food or drinks out of the cafeteria. Her hunger often causes her to cry. Since arriving at Hutto, Saule has lost significant weight.

(f)     Clothing

55.     The *Flores* Settlement requires defendants to allow Saule to wear "appropriate clothing," including "the right to wear his or her own clothes when available." Ex. 1 to Ex. A, at ¶¶ A(1), A(12). According to Physicians for Human Rights, detained migrants should be able to

wear their own clothing as a simple yet important way "to identify themselves as individuals and not criminals."[2]

56.    Defendants have prohibited and continue to prohibit Saule from wearing her own clothes, and have required and continue to require her to wear inappropriate clothing. Although she arrived at Hutto with her own clothing, she is forced to wear prison garb, which consists of one-colored scrubs, prison-issued underwear, socks, and soft-bottom shoes. Saule has three sets of these prison clothes. These three sets are not enough clothing to accommodate the laundry schedule. One day per week, she is forced to wear dirty clothing. She wears this same clothing to sleep and during recreation.

57.    Saule's prison-issued clothing is inadequate to keep her warm.  She often shivers due to the cold.

(g)    Medical Care

58.    The *Flores* Settlement requires defendants to provide Saule with "appropriate routine medical . . . care, . . . and emergency health care services, including a complete medical examination (including screening for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the minor was recently examined at another facility; appropriate immunizations in accordance with the U.S. Public Health Service (PHS), Center for Disease Control; [and the] administration of prescribed medication . . . ." Ex. 1 to Ex. A, ¶ A(2).

59.    Defendants have failed and are continuing to fail to provide Saule with appropriate routine medical care and emergency health services. When she developed a fever soon after her arrival at Hutto, her mother repeatedly asked for medical treatment for her. These

---

[2] Physicians for Human Rights and Bellevue/NYU Program for Survivors of Torture, *From Persecution to Prison: The Health Consequences of Detention on Asylum Seekers*, (Boston and New York City, June 2003), p. 191.

requests were made orally to the guards and in writing via sick call slips. However, she was not treated appropriately.

60.    Defendants failed to perform a complete medical examination within 48 hours of Saule's admission at Hutto. She has received no screening for infectious diseases, blood tests, or immunizations during her detention at Hutto.

(h)    Mental Health Care, Counseling, Acculturation and Adaptation Services

61.    The *Flores* Settlement requires defendants to provide Saule with "appropriate mental health interventions when necessary." Ex. 1 to Ex. A, at ¶ 2. It also requires defendants to provide her with "at least one (1) individual counseling session per week," "[g]roup counseling sessions at least twice a week," and "[a]cculturation and adaptation services which include information regarding the development of social and inter-personal skills." Ex. 1 to Ex. A, at ¶¶ A(6), A(7), A(8).

62.    Defendants have failed and are continuing to fail to offer Saule mental health treatment, individualized and group counseling, and acculturation and adaptation services. The mental health coordinator at Hutto has stated that, ideally, detainees at Hutto would be scheduled for weekly counseling visits, as well as group counseling sessions but that such treatment is not provided.  Saule often cries, and feels sad, frustrated, and angry by the trauma she has suffered and by her detention at Hutto.  Her depression is undiagnosed and untreated. There are no opportunities for her to receive the individualized and group counseling sessions or the acculturation and adaptation services that she needs to understand and cope with her detention.

(i)    Education

63.    The *Flores* Settlement requires defendants to provide Saule with adequate educational opportunities. Specifically, the Settlement states: "Educational services [shall be]

19

appropriate to the minor's level of development, and communication skills in a structured classroom setting, Monday through Friday, which concentrates primarily on the development of basic academic competencies and secondarily on English Language Training ("ELT"). The educational program shall include instruction and educational and other reading materials in such languages as needed. Basic academic areas should include Science, Social Studies, Math, Reading, Writing and Physical Education. The program shall provide minors with appropriate reading materials in languages other than English for use during the minor's leisure time." Ex. 1 to Ex. A, at ¶ A(4).

64.    Defendants have failed and are continuing to fail to provide adequate educational services appropriate for Saule's level of development. Until mid-December 2006, she received one hour of instruction each day in a class with approximately 70 students, ages 5 to 11. From mid-December to early January 2007, she received no instruction. Starting in early January, instructional time increased to four hours from Monday to Friday. Many of the subjects covered in Saule's class are too elementary for her grade level. She often colors during class time, sometimes watches movies, and is not learning a sufficient amount. Her mother has no contact with her instructor. The instruction at Hutto falls far short of Texas educational standards.

65.    Defendants have not given Saule access to appropriate reading materials for use during her leisure time. She was allowed in the library only during her orientation to the facility. She cannot find enough appropriate books to read for her age and language skills.

66.    While infrequent, when Saule actually does get some homework, she must ask for a pencil from a guard, complete it in the common area of the pod and immediately return the pencil back to the guard. Saule, like all children at Hutto, is not otherwise permitted writing implements in her pod.

(j)    Recreation and Leisure

67.    The *Flores* Settlement requires defendants to provide Saule with adequate recreation and leisure time. That recreation and leisure time "shall include daily outdoor activity, weather permitting, at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (this should not include time spent watching television). Activities should be increased to a total of three hours on days when school is not in session." Ex. 1 to Ex. A, at ¶ A(5).

68.    Defendants have failed and are continuing to fail to provide Saule with adequate recreation and leisure time. Until two weeks ago, she had been outside in the fresh air only a handful of times during her detention at Hutto. She was not permitted to go outside even once during the month of December 2006.  She continues to be unable to have sufficient recreation time for a thriving child.

69.    Recreation is typically one hour each day and takes place indoors. On days when school is not in session, the hour of recreation is not increased to three hours.  In the latter half of December, for example, Saule did not go outside at all despite school not being in session.

70.    Defendants have prohibited and continue to prohibit Saule from having her own toys.  Saule cannot have crayons, pens, or pencils in her cell.  In order to use them in her pod, she must borrow them and then return them to the guards.  She is only permitted this temporary use of a writing implement in her pod if she is in the common area and not in her cell.

(k)    Contact Visits With Non-Detained Family Members

71.    The *Flores* Settlement requires defendants to allow Saule to have contact visits with non-detained family members. Ex. 1 to Ex. A, at ¶ A(11).

72.    Defendants have barred and continue to bar Saule from having contact visits with non-detained family members. Although Saule has relatives who would like to visit her, she, her sister, and her mother have dissuaded him from visiting Hutto because everyone at Hutto is told that all family visits are non-contact visits. If Saule were to receive a family visitor, that visitor would have to sit separated from her by a Plexiglas wall and communicate with her through a telephone handset on the wall.  Because detainees and visitors must each speak through a single handset, only one visitor may speak to one detainee at any given time, further limiting communications.

73.    The public information officer at Hutto has explained that visits are non-contact to eliminate the need for strip searches following visitation. The district court in *Flores* ruled that routine strip searches of minors may not be conducted and that such searches may only occur if there is "a reasonable suspicion that a strip search of a particular juvenile will yield weapons or contraband." *Flores v. Meese*, 681 F. Supp. 665, 667069 (C.D. Cal. 1988). Thus, the public information officer's explanation for why Saule is not permitted to have contact visits with her non-detained relatives is inadequate.

(m)    Right to Privacy

74.    The *Flores* Settlement requires defendants to afford Saule a "reasonable right to privacy," which includes the right to "talk privately on the phone" and "receive and send uncensored mail." Ex. 1 to Ex. A, at ¶ A(12).

75.    Defendants have intruded and continue to intrude on Saule's privacy. Although she is given a sheet to cover the window in her cell door at times, guards have banged on her cell door demanding that she remove the window covering even when she is using the toilet. She is

22

forced to shower and dress in front of many other children. She is not given enough time to bathe properly.

76.     Defendants have prohibited and continue to prohibit Saule from talking privately on the phone; during orientation, she was told that her calls would be monitored by defendants. There are also no dividers separating phones in the common areas, thereby assuring a lack of privacy among the detainees.

77.     Saule does not have access to uncensored mail; all mail must be opened in front of Hutto guards. Saule's stepfather has mailed her books tailored to her stage of development, since appropriate books at Hutto are difficult, if not impossible, to find. However, Saule was not permitted to receive those books; the books were returned to her stepfather. Guards explained that all books must be sent directly from the publisher, a rule derived from the correctional setting.

78.     Cameras have recorded and continue to record Saule's behavior 24 hours a day. These cameras have the ability to zoom close enough to be able to read what a detained child is writing on a piece of paper.

(n)     Discipline

79.     The *Flores* Settlement prohibits defendants from subjecting Saule to "mental abuse," or any sanctions that "adversely affect . . . psychological well-being . . . ." Ex. 1 to Ex. A, at ¶ C.

80.     Defendants have subjected and continue to subject Saule to discipline that amounts to mental abuse and that adversely affects her psychological well-being. Guards at Hutto threaten children, like Saule, in a variety of ways for typical child behavior such as running around, making noise, and climbing on furniture. The guards have repeatedly threatened

23

that if a child acts inappropriately, she will be separated permanently from her parents. They have threatened that if a child has three incidents that are written up, the child will be reported to ICE. Guards also have threatened that if a parent behaves inappropriately by, for example, taking food out of the cafeteria to feed her child, the parent will be separated permanently from her child. Saule has heard these threats, which terrify her. On a number of occasions, this type of threat has been specifically directed at Saule. These threats amount to mental abuse and cause Saule severe anxiety.

## CLAIMS FOR RELIEF

81.     Defendants' policies, practices, acts, and omissions with respect to the children detained at Hutto deprive Saule of her rights under the *Flores* Settlement.

82.     Defendants' policies, practices, acts, and omissions show a pattern of officially sanctioned behavior that violates Saule's rights, and establish a credible threat of future injury to her.

83.     As a proximate result of defendants' policies, practices, acts, and omissions, Saule has suffered and will continue to suffer immediate and irreparable injury, including physical, psychological, and emotional injury. She has no plain, adequate or complete remedy at law to address the wrongs described herein. The injunctive relief sought by Saule is necessary to prevent continued and further injury.

## COUNT I: Release

84.     Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

85.     Defendants' failure to consider her for release with her family under reasonable conditions of supervision violates paragraph 14 of the *Flores* Settlement. Ex. A, at ¶ 14.

## COUNT II: Family Reunification

86.     Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

87.     Defendants' failure to provide family reunification services designed to identify Saule's relatives in the United States violates paragraph 18 and Exhibit 1, paragraph A(13) of the *Flores* Settlement.  Ex. A, at ¶ 18; Ex. 1 to Ex. A, at ¶ 13.

### COUNT III: Least Restrictive Setting

88.     Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

89.     Defendants' failure to place Saule in the least restrictive setting violates paragraph 11 of the *Flores* Settlement.  Ex. A, at ¶ 11.  Defendants' failure to provide a notice of reasons for housing Saule in a detention or medium security facility violates paragraph 24(C) of the *Flores* Settlement. Ex. A, at ¶ 24(C).

### COUNT IV: Licensing

90.     Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

91.     Defendants' failure to require Hutto to meet licensing requirements violates paragraphs 19, 6, and 24(B), and Exhibit 1 of the *Flores* Settlement. Ex. A, at ¶¶ 19, 6, 24(B); Ex. 1 to Ex. A.

### COUNT V: Individualized Needs Assessment

92.     Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

93.     Defendants' failure to conduct an individualized needs assessment for Saule violates paragraphs 19, 6, and 24(B), and Exhibit 1, paragraph A(3) of the *Flores* Settlement. Ex. A, at ¶¶ 19, 6, 24(B); Ex. 1 to Ex. A, at ¶ A(3).

### COUNT VI: Special Needs Assessment

94.     Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

95.    Defendants' failure to conduct a special needs assessment for Saule violates paragraph 7 of the *Flores* Settlement. Ex. A, at ¶ 7.

## COUNT VII: Suitable Living Accommodations

96.    Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

97.    Defendants' failure to provide Saule with "suitable living accommodations" violates paragraphs 19, 6, and 24(B), and Exhibit 1, paragraph A(1) of the *Flores* Settlement. Ex. A, at ¶¶ 19, 6, 24(B); Ex. 1 to Ex. A, at ¶ A(1).

## COUNT VIII: Food and Special Diets

98.    Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

99.    Defendants' failure to provide Saule with suitable food violates Paragraphs 19, 6, and 24(B), and Exhibit 1, paragraph A(1) of the *Flores* Settlement. Ex. A, at ¶¶ 19, 6, 24(B); Ex. 1 to Ex. A, at ¶ A(1).

100.    Defendants' failure to provide Saule with "special diets" that account for her youth violates paragraphs 19, 6, and 24(B), and Exhibit 1, paragraph A(2) of the *Flores* Settlement. Ex. A, at ¶¶ 19, 6, 24(B); Ex. 1 to Ex. A, at ¶ A(2).

## COUNT IX:Clothing

101.    Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

102.    Defendants' failure to allow Saule to wear her own clothes violates paragraphs 19, 6, and 24(B), and Exhibit 1, paragraph A(12)(a) of the *Flores* Settlement. Ex. A, at ¶¶ 19, 6, 24(B); Ex. 1 to Ex. A, at ¶ A(12)(a).

## COUNT X: Medical Care

103.    Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

104.    Defendants' failure to provide Saule with appropriate medical care violates paragraphs 19, 6, and 24(B), and Exhibit 1, paragraph A(2) of the *Flores* Settlement. Ex. A, Settlement at ¶¶ 19, 6, 24(B); Ex. 1 to Ex. A, at ¶ A(2).

## COUNT XI: Mental Health Treatment and Counseling

105.    Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

106.    Defendants' failure to offer Saule mental health treatment and individualized and group counseling violates paragraphs 19, 6, and 24(B), and Ex. 1, paragraphs A(2), A(6) and A(7) of the *Flores* Settlement. Ex. A, at ¶¶ 19, 6, 24(B); Ex. 1 to Ex. A, at ¶¶ A(2), A(6), A(7).

## COUNT XII: Acculturation and Adaptation Services

107.    Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

108.    Defendants' failure to provide Saule with acculturation and adaptation services violates paragraphs 19, 6, and 24(B), and Ex. 1, paragraph A(8) of the *Flores* Settlement. Ex. A, Settlement at ¶¶ 19, 6, 24(B); Ex. 1, at ¶ A(8).

## COUNT XIII: Educational Services

109.    Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

110.    Defendants' failure to provide Saule with adequate educational services appropriate for her level of development violates paragraphs 19, 6, and 24(B), and Exhibit 1, paragraph A(4) of the *Flores* Settlement. Ex. A, at ¶¶ 19, 6, 24(B); Ex. 1 to Ex. A, at ¶ A(4).

## COUNT XIV: Recreation and Leisure Time

111.    Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

112.    Defendants' failure to provide Saule with appropriate recreation and leisure time violates paragraphs 19, 6, and 24(B), and Exhibit 1, paragraph A(5) of the *Flores* Settlement. Ex. A, at ¶¶ 19, 6, 24(B); Ex. 1 to Ex. A, at ¶ A(5).

### COUNT XV: Contact Visits with Non-Detained Family Members

113.    Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

114.    Defendants' failure to allow Saule to have contact visits with non-detained family members violates paragraphs 19, 6, and 24(B), and Exhibit 1, paragraph A(11) of the *Flores* Settlement. Ex. A, at ¶¶ 19, 6, 24(B); Ex. 1 to Ex. A, at ¶ A.11.

### COUNT XVI: Right to Privacy

115.    Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

116.    Defendants' failure to respect Saule's reasonable right to privacy violates paragraphs 19, 6, and 24(B), and Exhibit 1, paragraph A(12) of the *Flores* Settlement. Ex. A, at ¶¶ 19, 6, 24(B); Ex. 1, ¶ A(12).

### COUNT XVII: Discipline

117.    Saule repeats and realleges paragraphs 1- 80, as if set forth fully herein.

118.    Defendants' have subjected Saule to disciplinary measures that have caused her humiliation and mental abuse, and that have had an adverse effect on her psychological well-being, in violation of paragraphs 19, 6, and 24(B), and Exhibit 1, paragraph 1(C) of the *Flores* Settlement. Ex. A, at ¶¶ 19, 6, 24(B); Ex. 1 to Ex. A, at ¶ 1(C).

### PRAYER FOR RELIEF

1.    WHEREFORE, Saule requests that this Court:

   (a) Issue a judgment declaring that the *Flores* Settlement is binding and enforceable and
       that defendants are violating Saule's rights under the *Flores* Settlement.

(b) Enter a permanent injunction requiring defendants to comply with all provisions of

the *Flores* Settlement with regard to Saule, including but not limited to releasing her

to and with her mother and her sister under reasonable conditions of supervision.

(c) Enter a restraining order prohibiting the government from separating Saule from her

mother and sister.

(d) Enter a preliminary injunction directing Defendants to release Saule, her sister, and

her mother under reasonable conditions of supervision.

(e) Award Saule reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412, and

other applicable law.

(f) Award such other relief as the Court deems appropriate and just.


Respectfully submitted,


Barbara Hines
Texas State Bar No. 09690800
Director – Immigration Clinic
THE UNIVERSITY OF TEXAS SCHOOL
OF LAW
727 E. Dean Keeton Street
Austin, TX 78705
(512) 232-1310

Lisa Graybill*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF TEXAS
P.O. Box 12905
Austin, TX 78711
(512) 478-7300

Vanita Gupta*
Elora Mukherjee*
Dennis Parker*

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION – Racial Justice Program
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

Gouri Bhat*
Tom-Tsvi M. Jawetz*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION – National Prison Project
915 15th Street, NW, 7th Floor
Washington, DC 20005
(202) 393-4930

Judy Rabinovitz*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION – Immigrants' Rights
Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

Sean Gorman
LEBOEUF, LAMB, GREENE &
MACRAE, LLP
Reliant Energy Plaza
1000 Main Street, Suite 2550
Houston, TX 77002
(713) 287-2000

* indicates *pro hac vice* motion pending

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by first class U.S. mail, on Tuesday, March 6, 2007, on the following:

Victor Lawrence (via Federal Express overnight delivery)
Department of Justice
Office of Immigration Litigation
National Press Building
529 14th St., NW
Washington, D.C. 20045

Michael Chertoff, Secretary
U.S. Department of Homeland Security
Washington, D.C. 20528

Julie L. Myers, Assistant Secretary
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Washington, D.C. 20528

John P. Torres, Director
Office of Detention and Removal Operations
801 I St., NW
Suite 900
Washington, DC 20536

Gary Mead, Assistant Director
Office of Detention and Removal Operations
801 I St, NW
Suite 900
Washington, DC 20536

Marc Moore
ICE Field Office Director, San Antonio
8940 Fourwinds Drive
San Antonio, TX 78239

Simona Colon
T. Don Hutto Residential Center
1001 Welch St., P.O. Box 1063
Taylor, Texas 76574

John Pogash
ICE National Juvenile Coordinator
Department of Homeland Security
Immigration & Customs Enforcement
800 I Street, NW, Suite 900
Washington, D.C. 20536

Johnny Sutton
U.S. Attorney for the Western District of Texas
United States Attorney's Office
601 NW Loop 410, Suite 600
San Antonio, Texas 78216

Alberto Gonzales
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001


Vanita Gupta

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

SAULE BUNIKYTE, by and through her
next friend and mother, RASA BUNIKIENE

## DEFENDANTS

MICHAEL CHERTOFF, Secretary of U.S. Department of Homeland Security (DHS), et al.

**(b)**  County of Residence of First Listed Plaintiff   Williamson
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   District of Columbia
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

*RECEIVED*
*MAR 0 6 2007*
*CLERK U.S. DISTRICT COURT*
*WESTERN DISTRICT OF TEXAS*
*BY_____ DEPUTY CLERK*

*A07CA 164 SS*

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Barbara Hines, University of Texas School of Law, 727 E. Dean Keeton, Austin, TX 78705, (512) 232-1310, et al.

Attorneys (If Known)

Victor Lawrence, Department of Justice, Office of Immigration Litigation, National Press Building, 529 14th St., NW, Washington, D.C. 20045

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☒ 2 | U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☒ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
N/A

Brief description of cause:
Enforcement of Flores v. Meese Settlement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE   March 6, 2007

SIGNATURE OF ATTORNEY OF RECORD   *Barbara Hines*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

405299

ORIGINAL

AO82
(Rev. 4/90)

## RECEIPT FOR PAYMENT
## UNITED STATES DISTRICT COURT
### for the
## WESTERN DISTRICT OF TEXAS

at _____

RECEIVED FROM Robert Lamb Green
of Macrae LLP
125 W 55th St
New York NY 10019

| Fund | | ACCOUNT | AMOUNT |
|------|--|---------|--------|
| 6855XX | Deposit Funds | 08600 | 60 00 |
| 604700 | Registry Funds | 510000 | 190 00 |
| 508800 | General and Special Funds | 086900 | 100 00 |
| 085000 | Immigration Fees | | |
| 086900 | Attorney Admission Fees | | |
| 322340 | Filing Fees | | |
| 322350 | Sale of Publications | | |
| 322360 | Copy Fees | | |
| 143500 | Miscellaneous Fees | | |
| 322380 | Interest | | |
| 322386 | Recoveries of Court Costs | | |
| 121000 | Restitution to U.S. Government | | |
| 129900 | Conscience Fund | | |
| 504100 | Gifts | | |
| 613300 | Crime Victims Fund | | |
| 510000 | Unclaimed Monies | | |
| 510100 | Civil Filing Fee (½) | | |
| | Registry Fee | | |

TOTAL 350.00

Case Number or Other Reference
1:07-CV-164    New Case

Blinky 1e   V Clerford   C

$ Checks and drafts are accepted subject to col-
lection and full credit will only be given when the
check or draft has been accepted by the financial
institution on which it was drawn.

| DATE | Cash | Check | M.O. | Credit |
|------|------|-------|------|--------|
| 3 6 07 | | ✓ | | |

DEPUTY CLERK: _____