UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| SAULE BUNIKYTE, by and through her next friend and mother, Rasa Bunikiene, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No.: A-07-CA-164-SS |
| v. | ) ) ) | |
| MICHAEL CHERTOFF, Secretary of U.S. Department of Homeland Security (DHS); JULIE L. MYERS, Assistant Secretary, U.S. Immigration and Customs Enforcement (ICE); JOHN P. TORRES, Director, Office of Detention and Removal Operations, ICE; MARC MOORE, ICE Field Office Director; GARY MEAD Assistant Director of Detention and Removal Operations at ICE; SIMONA COLON, ICE Officer in Charge; JOHN POGASH, ICE National Juvenile Coordinator, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **DEFENDANTS' REPLY TO EQUITABLE REMEDIES SOUGHT BY PLAINTIFF SAULE BUNIKYTE** |
| Defendants. | ) ) ) | |

JOHNNY K. SUTTON
United States Attorney

JOHN PANISZCZYN
Assistant United States Attorney

PETER D. KEISLER
Assistant Attorney General

DAVID J. KLINE
Principal Deputy Director

VICTOR M. LAWRENCE
Senior Litigation Counsel

EDWARD E. WIGGERS
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 616-1247
Fax: (202) 233-0397
Edward.Wiggers@usdoj.gov

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

FACTS ............................................................................................................... 3

    A.    Background on the Flores Settlement Agreement and Family Detention ............. 3

        1.    The *Flores* Litigation ............................................................... 3

        2.    Family Detention Centers ......................................................... 6

        3.    Oversight at Hutto ................................................................. 9

        4.    Paragraph 24 of the Flores Settlement Agreement ..................... 11

    B.    The T. Don Hutto Facility is a State-of-the-Art Facility ....................... 12

    C.    Plaintiff Bunikyte's Placement in the Hutto Facility ........................... 15

ARGUMENT ...................................................................................................... 16

    I.    PLAINTIFF HAS FAILED TO MAKE THE SHOWING NECESSARY FOR A PRELIMINARY INJUNCTION. ............................................................ 16

        A.    PLAINTIFF HAS NOT DEMONSTRATED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS. ............................... 16

            1.    Plaintiff Failed to Exhaust her Administrative Remedies ........... 16

            2.    Defendant ICE's Placement Decision was Not an Abuse of Discretion ...................................................................... 19

            3.    Plaintiff's Complaints About Services Provided at Hutto Are Wholly Without Merit .................................................... 20

        B.    PLAINTIFF HAS NOT ESTABLISHED THAT SHE WILL SUFFER IRREPARABLE HARM BY CONTINUING HER DETENTION WITH HER MOTHER AT HUTTO ................................................... 22

        C.    THE BALANCE OF HARMS TIPS AGAINST PLAINTIFF ................ 25

        D.    THE PUBLIC INTEREST CLEARLY FAVORS THE GOVERNMENT'S ABILITY TO ENFORCE IMMIGRATION LAW. ............................................................................... 26

i

II.    PLAINTIFF SHOULD NOT BE PERMITTED TO PURSUE DISCOVERY IN
       THE FORM THAT IT SEEKS ........................................................................ 26

CONCLUSION ............................................................................................................... 29

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### CASES

Canal Authority of State of Florida v. Callaway,
    489 F.2d 567 (5th Cir. 1974) ............................................................... 16

Clark v. Prichard,
    812 F.2d 991 (5th Cir. 1987) ............................................................... 16

Falek v. Gonzales,
    475 F.3d 285 (5th Cir. 2007) ............................................................... 17

Flores v. Ridge,
    CV-85-4544RJK(Px) (C.D. Cal. 2004) .................................................. 28

Mississippi Power & Light Co. v. United Gas Pipe Co.,
    760 F.2d 618 (5th Cir. 1985) ............................................................... 16

Mitchell v. Continental Airlines, Inc.,
    __ F.3d __, 2007 WL 678472 (5th Cir. March 7, 2007) ........................... 17, 18

Moosa v. INS,
    171 F.3d 994 (5th Cir. 1999) ............................................................... 21

Reno v. Flores,
    507 U.S. 292 (1993) ............................................................... 3, 4, 28

Troxel v. Granville,
    530 U.S. 57 (2000) ............................................................... 21

### STATUTES

6 U.S.C. § 279 ............................................................................................. 5

6 U.S.C. § 279(b)(1)(C) ............................................................................... 5

6 U.S.C. § 279(b)(1)(D) ............................................................................... 5

### Immigration and Nationality Act of 1952; as amended:

Section 237(a)(1)(A),
    8 U.S.C. § 1182(a)(1)(A) ............................................................... 2

Section 237(a)(1)(B),
    8 U.S.C. § 1182(a)(7)(A)(i)(I) ................................................................... 1

Section 237(a)(1)(G)(i),
    8 U.S.C. § 1182(a)(1)(G)(i) ..................................................................... 2

Section 237(a)(2)(A)(ii),
    8 U.S.C. § 1182(a)(2)(A)(ii) ................................................................. 1, 2

Section 237(a)(3)(B)(iii),
    8 U.S.C. § 1182(a)(3)(B)(iii) ................................................................. 1, 2

Section 242(a)(1),
    8 U.S.C. § 1252(a)(1) .......................................................................... 3, 4

Section 242(a)(2)(D),
    8 U.S.C. § 1252(a)(2)(D) ....................................................................... 17

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

SAULE BUNIKYTE, by and through her )
next friend and mother, Rasa Bunikiene, )
                                        )
        Plaintiff,                      )        Civil Action
                                        )        No.: A-07-CA-164-SS
v.                                      )
                                        )
MICHAEL CHERTOFF, Secretary of          )
U.S. Department of Homeland Security    )
(DHS); JULIE L. MYERS, Assistant        )
Secretary, U.S. Immigration and Customs )
Enforcement (ICE); JOHN P. TORRES,      )        **DEFENDANTS' REPLY**
Director, Office of Detention and Removal )      **TO EQUITABLE REMEDIES**
Operations, ICE; MARC MOORE,            )        **SOUGHT BY PLAINTIFF**
ICE Field Office Director; GARY MEAD    )        **SAULE BUNIKYTE**
Assistant Director of Detention and Removal)
Operations at ICE; SIMONA COLON, ICE    )
Officer in Charge; JOHN POGASH, ICE     )
National Juvenile Coordinator,          )
                                        )
        Defendants.                     )
                                        )

## INTRODUCTION

Plaintiff Saule Bunikyte is a minor alien who, along with her mother and sister, was

apprehended for being present in the United States illegally.  Immigration and Customs

Enforcement (ICE) placed Plaintiff Bunikyte and her family in the T. Don Hutto Family

Residential Center (Hutto) while the family's immigration proceedings continue.  The Hutto

facility is a state-of-the-art facility that provides housing, meals, recreation, educational services,

and other amenities to detained families who, like Plaintiff and her family, are in immigration

custody.  Plaintiff's mother was charged with violating sections 237(a)(1)(B), 237(a)(2)(A)(ii),

and 237(a)(3)(B)(iii) of the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1227(a)(1)(B),

1227(a)(2)(A)(ii), and 1227(a)(3)(B)(iii) for being unlawfully present by overstaying her guest visa, for being convicted of a crime for which a sentence of one year or longer may be imposed, and for conspiring to commit marriage fraud in order to remain the United States. Plaintiff Bunikyte was charged with violating INA §§ 237(a)(1)(A) and 237(a)(1)(G)(i), 8 U.S.C. §§ 1227(a)(1)(A) and 1227(a)(1)(G)(i), for being inadmissible at the time of entry or adjustment of status and for obtaining admission to the United States based on a visa procured on the basis of a marriage entered into less than two years prior to the alien's admission which is judicially annulled or terminated within two years subsequent to any admission.

On March 6, 2007, in response to multiple filings by the American Civil Liberties Union (ACLU), the Court ordered Defendants "to file a reply to the equitable remedies sought by" Plaintiff Bunikyte on or before March 16, 2007. March 6, 2007 Order at 4. In her motion for a preliminary injunction, Plaintiff Bunikyte requests two equitable remedies: (1) the immediate release "from the Hutto facility to and with her parent under reasonable conditions of supervision;" and (2) the permission for "plaintiff's counsel and her expert in psychology and juvenile conditions of confinement . . . to inspect Hutto and speak with plaintiff and her mother prior to any hearing" on this motion. Both requests for equitable relief should be denied.[1]

---

[1]Both requests for equitable relief have already been partially denied. Regarding the first request, the Court noted in its March 6, 2007 Order that the Flores Settlement Agreement (FSA), under which this lawsuit was brought, provides no authority to release adults. March 6, 2007 Order at 4. Regarding the second request, the Court found that, for purposes of the March 20, 2007 hearing for preliminary relief, plaintiff's expert in psychology may inspect the facility, but not interact with plaintiffs, their parents, or Defendants' representatives. March 13, 2007 Order at 6.

<u>FACTS</u>

**A.      Background on the Flores Settlement Agreement and Family Detention**

      1.      The *Flores* Litigation

This case is the most recent challenge in a twenty-two year-old series of lawsuits

regarding the care of juvenile aliens who are in the United States illegally.   At the time the first

challenge reached the United States Supreme Court in 1993, the class consisted of juvenile

aliens, "not accompanied by their parents or other related adults," who were apprehended by the

Immigration and Naturalization Service (INS). <u>Reno v. Flores</u>, 507 U.S. 292, 294 (1993).  In

<u>Flores</u>, the Supreme Court rejected plaintiffs' facial challenge to an INS regulation concerning

care of juvenile aliens. <u>Id.</u> at 305.  The Supreme Court described the <u>Flores</u> plaintiffs' three

principal attacks on the regulation as follows:

> First, they assert that alien juveniles suspected of being deportable have a
> "fundamental" right to "freedom from physical restraint," . . . and it is therefore a
> denial of "substantive due process" to detain them, since the Service cannot prove
> that it is pursuing an important governmental interest in a manner narrowly
> tailored to minimize the restraint on liberty.  Second, respondents argue that the
> regulation violates "procedural due process," because it does not require the
> Service to determine, with regard to each individual detained juvenile who lacks
> an approved custodian, whether his best interests lie in remaining in INS custody
> or in release to some other "responsible adult."  Finally, respondents contend that
> even if the INS regulation infringes no constitutional rights, it exceeds the
> Attorney General's authority under 8 U.S.C. § 1252(a)(1).

<u>Id.</u> at 299-300.  The Supreme Court rejected all three arguments.  Concerning the first argument,

the Supreme Court said that "[i]t seems to us, however, that if institutional custody (despite the

availability of responsible private custodians) is not unconstitutional in itself, it does not become

so simply because it is shown to be less desirable than some other arrangement for the particular

child." <u>Id.</u> at 303.  The Supreme Court said that plaintiffs' "alleged interest in being released into

3

the custody of strangers" only requires a "'reasonable fit' between governmental purpose (here, protecting the welfare of the juveniles who have come into the Government's custody) and the means chosen to advance that purpose." Id. at 305.  The Supreme Court concluded that the government regulations were constitutional.  Id.

The Supreme Court similarly rejected the Flores' plaintiffs second argument that the INS's regulation violated procedural due process because there is no "hearing" to determine whether the alien would be better off if released to some other responsible adult. Id. at 308.  The Court said, "[t]his is just the 'substantive due process' argument recast in 'procedural due process' terms, and we reject it for the same reasons." Id. at 308.  Finally, the Supreme Court also rejected plaintiffs' statutory argument that the "regulation goes beyond the scope of the Attorney General's discretion to continue custody over arrested aliens under 8 U.S.C. § 1252(a)(1)." Id. at 309.

On remand from the Supreme Court, the parties entered into a settlement agreement to resolve the case – the Flores Settlement Agreement (FSA).  The settlement agreement itself is a twenty-two page document with five exhibits.  The preamble in the settlement agreement acknowledges several points.  It acknowledges that the Supreme Court has upheld the constitutionality of the regulations on their face, that the parties had conducted extensive discovery, that the parties previously settled the standards of care in the Western Region, that trial and subsequent appeals would be complex and lengthy, and that settlement was in the parties' best interest.  The parties specifically agreed that the stipulated settlement agreement "constitutes a full and complete resolution of the issues raised in this action" and agreed to its terms.

4

The settlement agreement set forth the following termination date:

> All terms of this Agreement shall terminate the earlier of five years after the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with this Agreement, except that the INS shall continue to house the general population of minors in INS custody in facilities that are licensed for the care of dependent minors.

FSA ¶ 40.  On or about December 10, 2001, the parties agreed to extend the settlement agreement and modified ¶ 40 to effectuate the extension:

> All terms of this Agreement shall terminate 45 days following defendants' publication of final regulations implementing this Agreement.  Notwithstanding the foregoing, the INS shall continue to house the general population of minors in INS custody in facilities that are state-licensed for the care of dependent minors.

Id. at ¶ 40, Stipulation Extending Settlement Agreement and For Other Purposes; and Order Thereon.

On November 25, 2003, Congress enacted the Homeland Security Act (HSA).  Section 462 of the HSA, 6 U.S.C. § 279, transferred to the Director of the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS) functions under the immigration laws of the United States with respect to the care of unaccompanied alien children that were vested by statute in, or performed by, the Commissioner of Immigration and Naturalization (or any officer, employee, or component of the Immigration and Naturalization Service).  Accordingly, responsibilities of the former INS regarding the care of unaccompanied alien children are now handled by the ORR.  Among its duties are making placement determinations for all unaccompanied alien children who are in Federal custody by reason of their immigration status and implementing the placement determinations.  6 U.S.C. § 279(b)(1)(C) and (D).  Immigration and Customs Enforcement (ICE), a division of the

Department of Homeland Security (DHS), now handles care for accompanied minors in immigration custody, juvenile aliens who were apprehended with at least one adult relative.

On January 26, 2004, plaintiff's counsel in the original FSA brought suit on behalf of minors in immigration custody in the Central District of California challenging the Government's compliance with the FSA. See Docket No. 18, 85-cv-4544, C.D. Cal. This litigation terminated after almost 22 months of litigation on November 14, 2005, when plaintiffs, lacking evidence of non-compliance, filed a Notice of Withdrawal of their motion to enforce the FSA. Id. at Docket No 88.

This present litigation challenges ICE's care of accompanied minors at the Hutto facility. Plaintiff raises allegations that ICE is not in compliance with the FSA.

2.      Family Detention Centers

At the time the parties signed the Flores Settlement Agreement in 1997, there were no family detention facilities in use by the INS. See Declaration of Tim Perry at ¶ 9. To achieve the goal of housing families, and in response to the need for a facility that could detain families who were in expedited removal proceedings where detention is mandatory, ICE opened the Berks County Detention Center (Berks) in Berks, Pennsylvania in 2001. Id. at ¶ 9. Berks is a very small facility with a maximum capacity of 84 individuals. Id. Due to its limited size, the facility was unable to meet the Department's need to detain the large number of families who were being apprehended for coming into the United States illegally. Id. Further, as the facility is located in rural central Pennsylvania, the geographic location was considered less than ideal for meeting all of the agency's family detention needs. Id. Consequently, ICE made the decision to open the Hutto Residential Center, which is able to accommodate a larger number of families and is

6

located in the western region of the United States, where a greater number of families are apprehended.  Id.

Prior to the opening of family detention facilities, alien families caught illegally crossing the border were most often released rather than detained due to the limited amount of family bed space.  Id. at ¶ 6.   Additionally, when a decision was made to take a family into federal custody, the families, including children, were detained separately.   Id.  This practice created enforcement vulnerabilities, in that alien smugglers were reported to have brought children across the border along with groups of smuggled strangers and to have attempted to pass the groups off as family units.  Id. at ¶ 7. By exploiting children in this manner, smugglers were attempting to avoid detention of the aliens if they were apprehended.  Id.  In addition, families who subjected their children to the dangers of an illegal immigration journey also benefitted from the Government's former release policy.  Id.  By ending the practice of automatically releasing families apprehended at the border, DHS is able to deter human smuggling more effectively and to protect children from being subjected to the high-risk situations that are associated with human smuggling operations.   Id.

ICE contracted with Williamson County, Texas to open the Hutto Residential Center.  Id. at ¶ 8.  Using Hutto to detain families in one facility allows DHS to enforce the immigration laws of the United States effectively while simultaneously maintaining family unity.  Id. at ¶ 10. Both alien families and DHS benefit from the use of family detention facilities.   Id.  The benefits to families include a reduction of stress on both the parents and the children, the ability to allow for continuous contact between parents and children, and the ability to allow for parents to continue making appropriate decisions for their own children on a day-to-day basis.  Id.  Some

7

of the benefits to DHS include a reduction in costs for placement and removal, and better control over case management. Id.

When contracting with Williamson County for use of Hutto, ICE's Detention and Removal Operations (DRO) took considerable care to specifically identify significant adaptations and improvements, both cosmetic and structural, which had to be completed to ensure that the facility would be appropriate to care for the needs of families with children. Id. at ¶ 12. Required adaptations included adding safety precautions such as the installation of padding on the edges of bunk beds, modification of stair railings, and installation of bedrails. Id. DRO also specifically requested that items such as stuffed toys, arts and crafts supplies, playground equipment, and picnic tables be provided for the residents' use. Id. Further, the facility was specifically designed to allow for all members of a family to be housed in the same living unit and to provide a private space for each family. Id. Finally, DRO modified the living areas in order to facilitate indoor recreational activities. Id.

Like Berks, ICE originally used the Hutto Residential Facility to accommodate families it was processing for expedited removal. Id. at ¶ 11. Expedited removal is a statutory removal process applied to certain illegal aliens apprehended at the border whereby ICE expeditiously returns the aliens to their country of origin as soon as circumstances allow. Id. This expedited process considerably shortens the average length of stay in a detention facility. Id. For an alien subject to expedited removal, the length of stay is estimated to be twenty days or less. Id. Over time, considering the benefits to both the agency and to the families, ICE expanded the use of the Hutto Residential Facility to accept aliens who were apprehended on the interior and who were

8

not subject to expedited removal.  Id.  As such, the average length of stay at the Hutto Residential

Facility has increased to an average of fifty days.  Id.

     With the desired goal of detaining all adults and ending the process of "catch and

release," ICE considered detaining all families separately, meaning it would detain the parents or

guardians in an adult facility and transfer the children to ORR's care.  Id. at ¶ 10.  However, this

has been unnecessary, as Hutto Residential Center has allowed ICE to detain families in one

facility so as to permit the agency to effectively enforce the immigration laws of the United

States while simultaneously maintaining family unity.  Id.

     3.     Oversight at Hutto

     ICE subjects Hutto to significant oversight through its national detention standards

program.  Id. at ¶ 14.  In November 2000, the INS promulgated detention standards (hereinafter

"ICE Detention Standards").  Id. at ¶ 15.  The standards were the result of collaboration with the

American Bar Association, The Department of Justice, the INS, and other organizations involved

in pro bono representation and advocacy for immigration detainees.  Id.  The standards are

tailored to serve the needs of ICE detainees.  Id.  In addition, these standards are blended with

traditional juvenile standards in use prior to the enactment of the Homeland Security Act to

establish a baseline of performance requirements and oversight procedures for family facilities.

Id.

     Due to the unique nature of a family facility, these requirements, standards, policies, and

procedures, have evolved as ICE has gained experience with this program.  Id. at ¶ 16.  ICE

consistently makes these changes with the goal of providing for the safety, security, and comfort

of the family population, while at the same time meeting the appropriate needs of the facility's

complex demographics. Id.  To that end, the Assistant Secretary for ICE has actively solicited

input from Non-Governmental Organizations in the ongoing development of family detention

standards, and ICE thoroughly considers their comments as this process continues. Id.

     The ICE Detention Standards encompass a range of issues ranging from religious services

to access to legal services and materials. Id. at ¶ 17.  In order to ensure it operates detention

facilities in a safe, secure, and humane condition, INS implemented the Detention Management

Control Program (DMCP) in January 2002. Id. at ¶ 18.  The DMCP is a robust inspections

program that provides a series of requirements designed to ensure that inspections of detention

facilities are conducted in a uniform manner and focus on compliance with the ICE Detention

Standards. Id. Per the DMCP, all ICE detention facilities that detain aliens for more than

seventy-two hours are reviewed annually using procedures and guidance outlined in the DMCP.

Id. at ¶ 19.  DRO strives for one-hundred percent compliance with the ICE Detention Standards.

Id.  Therefore, if a facility is deficient in any portion of any standard, the facility is required to

provide a Plan of Action (POA) indicating the corrective measures that it will take in order to

address the deficiency, and DRO will follow-up with the facility to ensure that it implements the

corrective action and corrects the deficiency. Id.

     DRO staff also complete Special Assessments and Quality Assurance Reviews. Id. at ¶

20.  Special Assessments are used to evaluate the facility's policies and staff actions immediately

after a specific incident; for example, but not limited to, escape, death, suicide, disturbance, or

allegations of staff mistreatment. Id.  Special Assessments are conducted within one to two days

of the triggering incident. Id.  Quality Assurance Reviews are additional site visits are used as a

quality control measure for the inspection process. Id.  During a Quality Assurance Review, a

DRO staff officer reviews a facility to ensure that the conditions of confinement and compliance levels reported in the annual review are accurate. Id.

Pursuant to these policies, Hutto has already undergone two inspections. Id. at ¶ 21. The first inspection took place prior to its opening in April 2006, and the facility was inspected again in July 2006. Id. A third inspection is scheduled to be conducted in late March 2007. ICE is firmly committed to ensuring that family detention facilities operate in a safe, secure, and humane condition for children and adults alike. Id. at ¶ 25. In order to ensure the highest level of care and treatment for its detainee population, and to ensure independent internal management oversight, ICE has created a Detention Facilities Inspection Group (DFIG) within the Office of Professional Responsibility (OPR). Id. at 10. The purpose of the DFIG will be to independently validate DRO's detention inspections by performing quality assurance over the review process, insuring consistency in application of detention standards, and verifying corrective actions. Id. This new layer of OPR oversight will complement the current ICE DRO Detention Standards Compliance Program and ensure detention facilities are safe, secure, and providing appropriate living conditions. Id. Using these review procedures, ICE tailors Hutto's best practices to its residents' needs while identifying and correcting inadequacies. Id. The facility continues to evolve to become as family-friendly as possible. Id.

4.    Paragraph 24 of the Flores Settlement Agreement

Plaintiff's action was brought pursuant to Paragraph 24 of the FSA. By its terms, this paragraph limits a district court's review to whether ICE abused its discretion in making a placement decision, or whether, under *de novo* review, a particular facility in which the minor is placed "does not comply with the standards set forth in Exhibit 1" of the FSA. See FSA ¶ 24(B),

11

(C). Importantly, the FSA limits a district court's jurisdiction "to entering an order solely affecting the individual claims of the minor bringing the action." Id. at ¶ 24(B). Thus, district courts do not have jurisdiction under the FSA to enter an order affecting the claims of the minor's adult relatives for whom Plaintiff also requests relief. See Plaintiff's Requested Relief, PI Motion at 11, requesting release of Plaintiff's mother. The FSA only covers "minors" in immigration custody, not adults. FSA at ¶ 4. See also March 6, 2007 Order at 4 (noting that there is no authority under the FSA to release a minor's parents).

Given that no family detention facilities existed at the time the FSA took effect in 1997, the language of the Agreement is really geared toward fixing perceived problems related to the INS processing of unaccompanied minors who were the subject of the Flores litigation. See, e.g., FSA ¶¶ 14-18 (describing the policies applicable to reunifying unaccompanied minors with non-detained adult relatives). None of the provisions in the FSA specifically refer to minors who accompany their parents in detention, nor do any provisions provide explicit guidance related to immigration families in detention. For this reason, many of Plaintiff's arguments about the FSA's applicability to Hutto have the feel of forcing a round peg into a square hole. Nonetheless, ICE has worked to ensure that the Hutto facility is compliant with the relevant aspects of the FSA.

**B.     The T. Don Hutto Facility is a State-of-the-Art Facility**

The Hutto Residential Center, opened May 1, 2006. Declaration of Marc J. Moore (Moore Declaration) ¶ 9. ICE uses the facility to house families together who are either under a final order of removal or who are currently in administrative immigration proceedings. Id.

12

The Hutto Residential Center is designed to provide a complete range of services, including educational and medical services. Id. at ¶ 10. The facility has an educational program that provides a full range of instruction for school-aged children from kindergarten through twelfth grade, with five hours of core curriculum instruction per day. Id. In addition to the reading materials provided through the school system, the Hutto residents have access to three libraries, including a law library. Id. The facility also provides adult residents educational opportunities, such as classes in vocational skills, parenting, and arts and crafts. Id. at ¶ 11. In addition, the facility has a large computer laboratory that is currently being used in concert with the educational program, and will soon be made available to adults as well. Id.

The Hutto Residential Center provides for all of the residents' medical needs. Upon arrival, residents are provided with a thorough medical screening by Public Health Service ("PHS") professionals, which includes a mental health evaluation. Id. at ¶ 12. Residents receive excellent medical care, including, dental care, prenatal care, and counseling. Id. There is a nurse on staff 24 hours a day to respond to any emergency issues, and all requests for medical care of a non-emergent nature are addressed within 24 hours of the receipt of the request. Id. at ¶ 13. Further, while the facility has a pediatrician and a dentist on site to provide care at least once a week, it refers all services that it cannot adequately provide to an outside medical provider. Id. For example, a local obstetrician provides all prenatal care via regular off-site visits through Lone Star Circle of Care. Id.

The facility also provides children and adults with both indoor and outdoor recreational facilities. Outdoors, the facility has three large shaded pavilions, playground equipment, and a large outdoor play area where children can play a number of sports, including volleyball,

13

handball, baseball, and soccer. Id. at ¶ 14. In the indoor recreation area, residents can engage in games of ping-pong or basketball in the full-sized gymnasium. Id. ICE specifically designed the living areas to encourage recreation, and residents have access to a considerable amount of recreation equipment in these areas such as toys, televisions, and Sony Play Stations. Id.

CCA and ICE officials have taken great care to make the Hutto Residential Center a pleasant environment for both adult and adolescent residents. There is natural light in the hallways and living areas, and the walls are being painted in brighter, more aesthetically pleasing colors. Id. at ¶ 16. With the assistance of some of the residents, murals have been painted in some of the dormitory areas. The murals depict cheerful child-like scenes, such as castles, caterpillars, and butterflies. Id. In addition to making the facility brighter, the areas inside the facility have been opened up to provide greater freedom of movement to residents. Id. All correctional gates are hidden with wallboard and are kept open at all times. Id. Also, inside the facility, the doors are not locked; however, the facility is monitored to ensure the residents' safety and security. Id.

All the resident families receive a comprehensive orientation on the rules and services of the center soon after they arrive to make their transition into the Hutto Residential Center as smooth as possible. Id. at ¶ 17. The families also receive a handbook that they may keep which details all aspects of the center. Id. All CCA staff working in the facility are specially trained to interact with residents so that they can identify any potential emerging problems. Id. In addition to the general availability of the staff to address concerns, each separate living area has a case manager assigned to it, responsible for serving as a liaison between the residents and the facility, and assisting the residents with obtaining a resolution of their concerns. Id. at ¶ 19. The case

14

managers strive to resolve any of the issues that residents bring to their attention, and if that is

not possible, the residents' concerns are then elevated through a grievance process. Id.

This attention to the residents' needs is also apparent in the food service provided at

Hutto. Id. at ¶ 20. Residents receive three dietitian-approved meals every day, and, in an effort

to satisfy varying tastes and dietary preferences, CCA staff survey the residents frequently and

adjust the menu according to the responses received. Id.

C.      **Plaintiff Bunikyte's Placement in the Hutto Facility**

Plaintiff, who is eight years old, her sister, and her mother are residents at Hutto. See

Exhibit 1, Applicable Documents from Plaintiff's and her Mother's A-Files. Plaintiff and her

family are citizens of Lithuania. Id. Plaintiff entered the United States on March 8, 2005 on an

immigrant visa based on her mother's marriage to a United States citizen. Id. Plaintiff's mother,

however, fraudulently married the citizen in order to evade immigration laws. Id. Plaintiff's

mother pled guilty to conspiracy to enter into marriage for the purpose of evading a provision of

the immigration laws and entering into a marriage for the purpose of evading a provision of the

immigration laws. Id. Plaintiff's mother received a sentence of three years' probation and a

$200.00 special assessment. Id. Plaintiff's mother divorced her first (fraudulent) husband in

October 2005, married a second United States citizen in November 2005, and her new husband

submitted a new application for adjustment of immigration status on her behalf in January 2006.

Id. In October 2006, the United States Citizenship and Immigration Service terminated the

application for adjustment of status Plaintiff's new stepfather filed on her mother's behalf. Id.

Plaintiff's family currently has a hearing before an immigration judge scheduled for March 26,

2007. Id.

**ARGUMENT**

## I.   PLAINTIFF HAS FAILED TO MAKE THE SHOWING NECESSARY FOR A PRELIMINARY INJUNCTION.

In determining whether to grant a preliminary injunction, the Court considers:  (1) whether the movant has a substantial likelihood of success on the merits; (2) whether there is a substantial threat of irreparable injury to the movant if an injunction is not granted; (3) the extent to which the balance of hardships favors the movant; and (4) whether the public interest will be disserved by the injunction.  Clark v. Prichard, 812 F.2d 991, 993 (5th Cir. 1987); Canal Authority of State of Florida v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974) (en banc).  "In considering these four prerequisites, the court must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion."  Canal Authority, 489 F.2d at 573.  These requirements are not balanced, but rather each one must be met before the court can grant emergency injunctive relief. Mississippi Power & Light Co. v. United Gas Pipe Co., 760 F.2d 618, 621 (5th Cir. 1985). Because Plaintiff cannot meet a *single one* of these factors, the Court should deny the request for a preliminary injunction.

### A.   PLAINTIFF HAS NOT DEMONSTRATED A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

The first factor Plaintiff must show is that she has a substantial likelihood of success on the merits.  This she fails to do.

#### 1.   Plaintiff Failed to Exhaust her Administrative Remedies

As Plaintiff noted in her motion for a preliminary injunction, her action is brought pursuant to Paragraph 24 of the FSA.  PI Motion at 4-5.  Paragraph 24(E) of the FSA imposes a

16

mandatory requirement for potential plaintiffs to attempt informal resolution of their complaints. The FSA provides "[p]rior to initiating any such action . . . the minor and/or the minors' attorney *shall* confer telephonically or in person with the United States Attorney's office in the judicial district where the action is to be filed . . ." (emphasis added).  See <u>Black's Law Dictionary</u>, 8th Edition (2004) (defining "shall" as "having a duty to" or "is required to").  Paragraph 24(E) of the FSA requires telephonic or in-person consultation "with the United States Attorney's office in the judicial district where the action is to be filed, in an effort to informally resolve the minor's complaints without the need of federal court intervention."

Plaintiff did not satisfy this pre-requisite prior to bringing suit.  Plaintiff's counsel merely sent a letter to the United States Attorney's office in Austin, Texas, on February 21, 2007, and an additional letter to Defendants' counsel in the Department of Justice Office of Immigration Litigation on March 1, 2007, one day before the ACLU issued a media advisory announcing its intention to file the present litigation.  See Exhibit 2, Media Advisory Issued by ACLU on March 2, 2007.  The FSA's terms are clear:  a potential plaintiff under Paragraph 24 must first seek informal resolution of his or her concerns prior to initiating litigation.  Paragraph 24(E)'s requirements are similar to other requirements in the INA which require that an alien must first exhaust all of his administrative remedies prior to bringing suit.  See <u>Falek v. Gonzales</u>, 475 F.3d 285, 291 (5th Cir. 2007) (citing 8 U.S.C. § 1252(a)(2)(D)).

Prior to suing in federal court, a potential plaintiff must exhaust any contractually-created procedural remedies.  See <u>Mitchell v. Continental Airlines, Inc.</u>, __ F.3d __, 2007 WL 678472 (5th Cir. March 7, 2007) (affirming grant of summary judgment against one plaintiff for failure to exhaust contractual remedy).  In <u>Mitchell</u>, flight attendants sued the airline that employed them

17

over unfavorable seniority reclassifications. Id. at *1-3. The collective bargaining agreement governing the employment relationship between the flight attendants and the airline, however, established a grievance system with which they had to comply prior to filing suit. Id. at *1, 4. Since one of the flight attendants failed to avail herself of the grievance system at all, the Court affirmed the grant of summary judgment against her. Id. at *5.

Plaintiff's situation is similar to that in Mitchell. Plaintiff is a member of a class, minors in ICE's custody, who negotiated an agreement under which they agreed to pursue an alternative form of remedy prior to filing suit. Like the labor union in Mitchell, Plaintiff's class made a decision to agree to an effort at informal resolution prior to seeking to litigate Plaintiff's rights under the FSA. This Court should require Plaintiff to adhere to the terms of that agreement.

Had Plaintiff complied with Paragraph 24(E), Plaintiff would have learned why Defendants do not believe the particular provisions of the FSA, on which they rely, apply to family detention centers. Plaintiff would have also learned how she is mistaken in almost all of her allegations. Finally, Plaintiff would have learned about the multiple changes that ICE is making to the Hutto facility to improve the environment for parents and children. Defendants would have been able to discuss this information, but Plaintiffs filed ten lawsuits after first contacting the Department of Justice Office of Immigration Litigation by letter on March 1, 2007. Moreover, the ACLU's actions on the following day belies the seriousness of Plaintiff's attempt at conciliation in sending the March 1, 2007 letter. On March 2, 2007, and without awaiting a response, ACLU issued a "Media Advisory" informing the media that it intended to file suit on March 6, 2007. See Exhibit 2. Plaintiff failed to comply with Paragraph 24(E), and as a result, Plaintiff failed to exhaust her administrative remedies. Accordingly, this lawsuit

18

should be dismissed.

2.    Defendant ICE's Placement Decision was Not an Abuse of Discretion

To the extent the Court excuses Plaintiff for failing to exhaust her administrative

remedies, the Court should nevertheless find that ICE did not abuse its discretion by placing

Plaintiff in the Hutto facility.  ICE's placement decision considered the well-being of the minor

by keeping the minor with her parents.  Given that one of the FSA's main purposes is to achieve

reunification of detained minors and their adult relatives, ICE furthers this purpose by keeping

the family as a unit.  ICE's decision to keep the Bunikyte family together, and place Plaintiff in a

facility which provides a comprehensive educational curriculum for kindergarten through twelfth

grade, full medical and mental health services, qualified social workers to assist with any issues

the families may have, a wide range of religious services, certified dietician-prepared meals

designed to meet children's needs, indoor and outdoor recreational facilities, age-appropriate

reading material, and toys and other items for the children's entertainment is no abuse of

discretion.  Moore Declaration at ¶¶ 10, 11, 14, and 18.

Paragraph 11 of the FSA, describing the statements of general applicability for the

Agreement, instructs that:

> 11.  The INS treats, and shall continue to treat, all minors in its custody with
> dignity, respect and special concern for their particular vulnerability as minors.
> The INS shall place each detained minor in the least restrictive setting appropriate
> to the minor's age and special needs, provided that such setting is consistent with
> its interests to ensure the minor's timely appearance before the INS and the
> immigration courts and to protect the minor's well-being and that of others.

Plaintiff cannot reasonable claim that her well-being is not achieved by keeping her

together with her mother.  Plaintiff cannot demonstrate that ICE's placement, taking into account

the minor's well-being, is an abuse of discretion.

Several provisions of the FSA indicate that the safety and well-being of the child is paramount in making placement decisions. While Paragraph 14 calls for a minor's release without "unnecessary delay," it first imposes the requirement for ICE to determine that the minor's release will not endanger his or her safety, among other concerns. In Paragraph 15(A), the FSA requires ICE to obtain an Affidavit of Support as well as an agreement that the custodian will provide for "the minor's physical, mental, and financial well-being" from any custodian, even a parent, before releasing a minor into the custodian's care. Finally, even with the creation of a general policy favoring release, the FSA authorizes ICE to hold minors in secure facilities when it is necessary to protect the minor's safety in Paragraph 21(E).[2] Defendants' placement decision, and decision to keep Plaintiff with her mother, are decisions made for the safety and well-being of Plaintiff and are fully compliant with the FSA.

3.    Plaintiff's Complaints About Services Provided at Hutto Are Wholly Without Merit

Contrary to Plaintiff's assertions, Hutto complies with the standards set forth in Exhibit 1 of the FSA. Regarding the first requirement in Part A of Exhibit 1, Hutto provides "suitable living accommodations, food, appropriate clothing, and personal grooming items." Moore Declaration at ¶¶ 7-8, 17, 20. Through the Public Health Service (PHS), Hutto provides excellent medical care, to include mental health care, and adequate dental care. Id. at ¶¶ 13-14.

---

[2]The "General Policy in Favor of Release" in the FSA was for the express purpose of achieving reunification of *unaccompanied* children with their parents or other adult relatives. In this case, Plaintiff is already unified with her mother, and no policy purpose is achieved by releasing her. To the contrary, as explained above, the separation of Plaintiff from her mother cannot possibly be in her best interest.

Emergency medical services are also available as required. Id. at ¶ 14. Family planning counseling services are available. Id. at ¶ 13. Additionally, PHS care providers screen each individual when they arrive at the facility, to include a mental health evaluation. Id. at ¶ 12.

Hutto staff orient families to the facility upon their arrival, and the educational department conducts an assessment of each child's needs. Id. at ¶¶ 10, 17. The Hutto staff has employees trained to identify residents who may require additional counseling and assigned to interact with the residents and identify any potential problems. Id. at ¶ 17. Coupled with the medical evaluation each new resident receives, these practices substantially comply with the services outlined in Exhibit 1 of the FSA when viewed in the context of a family detention facility.

Furthermore, Hutto provides excellent educational opportunities for the children, and has a good recreational plan. Id. at ¶¶ 10, 14. Hutto has counselors available to the families residing there, including social workers assigned to each living area. Since the parents are directly responsible for their children, the staff can do no more than make counseling available. See Moosa v. INS, 171 F.3d 994, 1006 (5th Cir. 1999) (including requirement to attend counseling in probation constituting punishment and "a restraint on . . . liberty"); Troxel v. Granville, 530 U.S. 57, 68-69 (2000) (parents' liberty interest of care, custody, and control of children "is perhaps the oldest of the fundamental liberty interests recognized by this Court") (plurality opinion). Moore Declaration at ¶ 8.

Hutto staff are trained to assist all residents in their physical, mental, and emotional and social growth, as well as to assist residents from such a wide range of cultural backgrounds to live and interact with each other. Id. at ¶ 17. All residents also have access to religious services

21

of their choice. Id. at ¶ 18. Visitation privileges are available as envisioned in the FSA. Id. The facility also affords its residents as much privacy as possible based on its unique purpose as a family detention center and on the facility's operational requirements. Id. at ¶ 18.

Since Hutto keeps the families who reside there together, no reunification is necessary as contemplated for unaccompanied minors. Additionally, residents receive legal services information at orientation, and it is available in each living area. Id. at ¶ 18. For these reasons, Hutto complies with the requirements in Part A of Exhibit 1, particularly when viewed in the context of family detention.

Part B requires that a program offer services in the minors' native language. Given the wide number of languages and nationalities residing in Hutto on a daily basis, the facility faces unique challenges in this regard. Orientation materials, however, are provided in each family's native language, and translation resources are available for any languages not spoken by staff members. Id. at ¶ 17. Furthermore, the facility's discipline program complies with Part C of Exhibit 1. Id. at ¶ 8. The educational plans and efforts of the case managers comply with the requirements in Part D. Id. at ¶¶ 10, 19. Finally, ICE maintains records as required in Parts E and F. Id.

Accordingly, Plaintiff cannot establish a likelihood of success on her claims.

B.    PLAINTIFF HAS NOT ESTABLISHED THAT SHE WILL SUFFER IRREPARABLE HARM BY CONTINUING HER DETENTION WITH HER FAMILY AT HUTTO

In any event, even if Plaintiff had shown a substantial likelihood of success on the merits, she failed to demonstrate a substantial threat of irreparable injury. Plaintiff currently resides with her mother, receives quality medical care, nutritional meals, quality educational instruction, and

22

recreational opportunities as described above. Plaintiff's mother has mental health care providers

and social workers available should Plaintiff need them. Additionally, ICE is constantly working

to improve conditions at Hutto to best meet all of the residents' needs. See Perry Declaration at

¶¶ 13, 16. These conditions are likely better than those Plaintiff would face should the Court

order her release.

There is no authority under the FSA for this Court to order the release of Plaintiff's

mother. This Court recognized as much in its March 6, 2007 Order:

> Plaintiffs have cited no authority for the proposition that Defendants may not
> release the minor Plaintiffs without simultaneously releasing their parents. In
> particular, paragraph 14 of the Flores agreement, on which Plaintiffs rely,
> obligates Defendants to release minor plaintiffs "without unnecessary delay" but
> does not direct the release of a parent in custody or require the continued
> detention of minors until the simultaneous release of their parents can be obtained.

March 6, 2007 Order at 4. See also FSA ¶ 9 ("This Agreement sets out nationwide policy for the

detention, release, and treatment of *minors* in the custody of the INS." (emphasis added)); FSA ¶

14 (Immigration and Naturalization Service (INS) to release *minors* unless detention necessary

for safety or to ensure appearance before immigration court; parents one of several possible

custodians); and FSA ¶ 18 (INS to work toward family reunification and release of *minors*

pursuant to paragraph 14).

Since there is no authority under the FSA for the Court to order the release of Plaintiff's

parents, and this Court has already recognized this flaw in Plaintiff's argument, the only solution

that the Court could offer is a release of the Plaintiff which would result in her separation from

her mother. Under this arrangement, and unless another adult relative can be located, ICE would

have to transfer Plaintiff to ORR in HHS, the agency that is currently responsible for supervising

the care of unaccompanied minors who are in immigration proceedings.  Defendants strive to avoid separating children from their parents.  While ORR and HHS comply with the terms of the FSA, Plaintiff has made no showing that services would be any better from ORR than the services provided by ICE at Hutto.  Indeed, even if Plaintiff were not rendered "unaccompanied" by her release from custody with her mother and, under an as-yet-undetermined authority, placed in a foster care facility or licensed program as defined in the FSA near Hutto, Plaintiff has not shown how services there would be any better than those Hutto offers and how Plaintiff would benefit from separation from her mother.

Plaintiff relies on declarations from a psychiatrist and psychologist which discuss the effects of detention in a "prison-like environment" on children and families.  Declaration of John Sargent, MD, at ¶ 3; Declaration of David R. Blackburn, PhD, at ¶ 4.  While the Hutto facility is a former state prison, it is not run as a "prison-like environment."  There are no physical barriers to movement within the facility.  Moore Declaration at ¶¶ 15, 16.  Hutto provides a "nonsecure" setting where families can interact with one another and other families.  Id. at ¶ 8.  Recreational activities are tailored to all age levels, and are freely available in common living areas.  Id. at ¶ 14.  ICE also required extensive modifications to the facility to make them more appropriate for families with children.  Id. at ¶ 7.  In addition, the facility continues to evolve to meet the needs of the families who reside there.  Perry Declaration at ¶¶ 13, 16.  Hutto does not pose the problem Plaintiff's experts fear, and Plaintiff cannot show she will suffer irreparable harm from residing there.

C.    THE BALANCE OF HARMS TIPS AGAINST PLAINTIFF

In addition to Plaintiff's putting forth no legally cognizable claims or evidence irreparable harm, the balance of harms required by the preliminary injunction analysis tips sharply against Plaintiff. The preliminary injunction Plaintiff requests will have a profoundly negative impact on Defendants by adversely affecting this and other placement decisions of immigration detainees. If the Court were to order the release of juveniles from Hutto, it would have the effect of reversing policies ICE adopted to protect children from the dangers of smuggling operations and to inhibit the smuggling operations themselves. Perry Declaration at ¶ 7. The problems such a decision would pose are indeed severe. Prior to residential centers like Hutto, ICE was unable to ensure that any group containing minors purporting to be a family would appear for immigration proceedings. Id. at ¶ 5-6. If ICE can no longer detain families as a unit, smuggling operations would resort to former practices of using children to avoid their own detention. As a result, the harm to the immigration system and to other children like Plaintiff would be great if Plaintiff were to receive the requested relief.

On the other hand, Plaintiff does not stand to gain much should the Court grant her the injunctive relief she seeks. Without authority under the FSA to release her mother, the only relief the Court could provide is to release Plaintiff, which would likely result in Plaintiff's transfer to ORR. But, in her motion for a temporary restraining order, Plaintiff sought to prevent separation from her mother. Accordingly, Plaintiff concedes that the only relief the Court can provide under the FSA – release of the Plaintiff – is relief which Plaintiff does not want. Accordingly, Plaintiff is hard-pressed to say that her situation would improve through receipt of injunctive relief, and, under these circumstances, the balance of harms clearly tips against Plaintiff.

D.    THE PUBLIC INTEREST CLEARLY FAVORS THE GOVERNMENT'S
ABILITY TO ENFORCE IMMIGRATION LAW.

Should an injunction enter, the harm to the public interest reaches beyond the release of

Plaintiff.  As the Secretary of Homeland Security has concluded:

> Illegal immigration hurts everyone.  It flouts the rule of law, and it allows criminal
> elements to enter our country.  It undercuts those who patiently pursue legal
> immigration proceedings.  It places heavy economic strains on towns . . . [a]nd it
> threatens the lives of the migrants themselves.  The human smugglers and
> traffickers . . . who bring them to the country all too often rob them, abuse them
> and leave them for dead.  In addition to this human cost, these smugglers also
> traffic in guns and narcotics, a threat to the stability of both the United States and
> Northern Mexico.  [I]f we can not control our borders, we leave the way open for
> terrorists hoping to do us harm.

Statement of Secretary Michael Chertoff, Comprehensive Immigration Reform II, before the

United States Senate Judiciary Committee (2005).

As discussed above, the decision to employ facilities like Hutto rested in part on the risk

to children from smuggling practices that developed in response to past policies.  Perry

Declaration at ¶ 5.  Another basis for that decision is the significant impediments a general

release-based policy for families creates for ICE's ability to enforce the nation's immigration

laws.  Id.  The alternative to facilities like Hutto is the separation of families once ICE detains

them; an option neither side finds attractive.  It is in the public interest not to expose children to a

greater risk of harm, to facilitate ICE's ability to enforce the nation's immigration laws, and to

preserve the integrity of families undergoing immigration proceedings.

II.    **PLAINTIFF SHOULD NOT BE PERMITTED TO PURSUE DISCOVERY IN
THE FORM THAT SHE SEEKS**

Plaintiff has not provided any legitimate argument justifying his request to have Dr.

Andrew Clark review medical records and to allow Dr. Clark to inspect the Hutto facility and

26

interview Plaintiff. The current proceeding, arising under Paragraph 24 of the FSA, does not

extend to a general challenge of Hutto as an appropriate facility under the FSA; it is limited to

two specific issues.

> Any minor who disagrees with the INS's *determination to place*
> *that minor in a particular type of facility*, or *who asserts that the*
> *licensed program in which he or she has been placed does not*
> *comply with the standards set forth in Exhibit 1* attached hereto,
> may seek judicial review in any United States District Court with
> jurisdiction and venue over the matter to challenge that placement
> determination or to allege noncompliance with the standards set
> forth in Exhibit 1.

FSA at ¶ 24(B) (emphasis added). Essentially, Plaintiff's assertions of inadequate facilities and

services as documented in the declarations accompanying Plaintiff's pleadings are the extent of

the relevant evidence supporting Plaintiff's case, and the facility inspection sought by Plaintiff

would not provide useful information. The Court has already granted relief in the form of a

facility inspection by Dr. Andrew Clark pursuant to its March 13, 2007 Order. Dr. Clark

conducted his inspection on March 15, 2007. At that time, he had the opportunity to take a 3-

hour tour of the facility, and to examine first-hand the conditions there. This tour is sufficient for

Plaintiff to make her case as to whether a preliminary injunction should be entered for ICE

failing to comply with the standards set forth in Exhibit 1 of the FSA. In its March 13, 2007

Order, the Court declined to grant additional relief such as examination of records and Dr.

Clark's proposed meeting with Plaintiff because "[t]his type of detailed discovery can wait until

Defendants have had a chance to file an answer in this case." March 13, 2007 Order at 2. As the

Court recognized, "[f]or purposes of the March 20, 2007 hearing on preliminary equitable relief,

the Plaintiffs' own allegations regarding the conditions of their detention, combined with

Plaintiffs' expert testimony on the effect of those conditions, should be enough to establish whether there is any likelihood of success on the merits justifying preliminary relief." Id.

Moreover, the question is not whether the facilities available are ideal or meet an independent standard for those housing families; the only question under Paragraph 24(B) that even touches on the quality of the facilities is whether they comply with Exhibit 1 from the FSA. Plaintiff offers no tangible evidence that Hutto does not comply with Exhibit 1 of the FSA.

Inspections and other such activities would better serve Plaintiff if she were bringing an action under Paragraph 37 to enforce the FSA, alleging that conditions at Hutto constituted a violation of the agreement. Such a challenge would afford Plaintiff the opportunity to argue an interpretation of the FSA that would preclude facilities housing families as a unit. Such a case would be somewhat weak, however, in light of the fact the original Flores plaintiffs brought an enforcement action in 2004 with full awareness of ICE's policy of housing families at a facility in Pennsylvania, and did not challenge that facility as a violation of the FSA. See Memorandum of Points and Authorities in Support of Motion to Enforce Settlement of Class Action at 18 (referring to Berks facility without challenging it as a violation of the FSA), filed in Flores v. Ridge, CV-85-4544RJK(Px) (C.D. Cal. 2004). The proper focus of this action is on Plaintiff's allegations about the facility, and the documented conditions and practices at the facility.

Essentially, Plaintiff's motion seeks discovery in a matter not before the Court, and not within this Court's jurisdiction under the terms of the FSA. Likewise, counsel's desire to have experts examine their client is beyond the scope of the present action, for such examinations are not relevant to a case that involves only the question of whether Hutto provides the proper services for the families it houses. This Court should deny the present motion for being beyond

28

the scope of the present litigation.

## **CONCLUSION**

Plaintiff's case fails every test for preliminary injunctive relief, and Plaintiff's motion

should therefore be denied for any or all the reasons set out above.

Respectfully submitted,

JOHNNY K. SUTTON
United States Attorney

JOHN PANISZCZYN
Assistant United States Attorney

PETER D. KEISLER
Assistant Attorney General

DAVID J. KLINE
Principal Deputy Director

VICTOR M. LAWRENCE
Senior Litigation Counsel


/s/ Edward E. Wiggers
_____

EDWARD E. WIGGERS
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 616-1247
Fax: (202) 233-0397

## CERTIFICATE OF SERVICE

The undersigned certifies that on this <u>16th</u> day of March 2007 a true and

correct copy of the foregoing Defendants' Reply to Equitable Remedies Sought by Plaintiff Saule

Bunikyte was served by E-mail and Federal Express on the following counsel of record:


        Judy Rabinovitz, Esq.
        ACLU Legal Department
        125 Broad Street
        New York, NY 10004


                      /s/ Edward E. Wiggers
                      _____
                      U.S. Department of Justice