IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

SAULE BUNIKYTE, by and through her )
next friend and mother, Rasa Bunikiene, )
)                          Civil Action
Plaintiff, )               No. 1:07-cv-164-SS
)
v. )
)
MICHAEL CHERTOFF, *et al.*, )
)
Defendants. )
_____)

**PLAINTIFF'S REPLY IN SUPPORT OF HER MOTION FOR A PRELIMINARY
INJUNCTION ORDERING HER IMMEDIATE RELEASE FROM HUTTO
WITH HER MOTHER**

**<u>Introduction</u>**

The two fundamental imperatives of the *Flores* Settlement are that family unity should be

preserved, and that children should be housed in the least restrictive setting appropriate to their

age and needs.  Plaintiff's evidence powerfully demonstrates that the Hutto facility is *not* the

least restrictive setting for plaintiff, and that conditions at Hutto violate the Settlement in

numerous specific ways.  Because plaintiff is detained with her mother and *Flores* prioritizes

family unity and release to a parent whenever possible, the only way for plaintiff to be afforded

her full rights under the Settlement is for her to be removed from Hutto *with her mother*—either

released from custody under reasonable conditions of supervision, or transferred to a less

restrictive, home-like environment that complies with *Flores* standards.  In responding to

plaintiff's motion requesting such preliminary relief, defendants force an artificial choice upon

this Court.  Defendants suggest that under *Flores* the Court may order plaintiff's release without

her mother—an action that all parties agree would be indelibly traumatic and against the best

interests of plaintiff; *or* the Court must leave plaintiff at Hutto with her mother, despite clear

1

indications that the facility is not *Flores*-compliant and that plaintiff may be irreparably harmed by the experience of being detained there.

The Hobson's choice advanced by defendants mischaracterizes plaintiff's claims and, if accepted, would eviscerate her rights under the *Flores* Settlement.  Plaintiff does not contend that the Settlement protects adults in ICE custody or compels the release of her mother based on *her* claims under the Settlement, as defendants suggest.  *See* Defs.' Resp. at 11-12.  Rather, plaintiff seeks to enforce her *own* rights under the Settlement, and argues that her release from custody with her mother is compelled by the Settlement's fundamental imperatives to promote family unity and to house minors in the least restrictive setting.  This Court has explicit authority under Settlement to enter an order "affecting the individual claims of the minor bringing the action."  Stipulated Settlement Agreement, Ex. A, March 6, 2007 App. of Exs. (hereinafter "March 6 App."), ¶ 24(B).[1]  As plaintiff will argue more fully below, her individual claims under the Settlement are directly affected by her ability to remain in close proximity to her mother—an outcome that is clearly favored by the general policy favoring release to a parent under *Flores*.  Ex. A ¶ 14.  Therefore, it is within this Court's equitable power to order the simultaneous release of the parent in enforcing the *child's* rights under the *Flores* Settlement.

The artificial choice presented by defendants is also misleading because it assumes that there are no feasible alternatives to detention that would ensure plaintiff's and her mother's timely appearance at immigration proceedings.  In fact, plaintiff's stepfather, a U.S. citizen, has executed an Affidavit of Support (Form I-134) pursuant to the *Flores* Settlement, Ex. A ¶ 15, guaranteeing that he is willing and able to support plaintiff and her mother and sister in his home

---

[1]     Although the docket reflects that plaintiff's March 6, 2007 Appendix of Exhibits is attached only to Plaintiff's Motion for a Temporary Restraining Order, the Appendix was also filed in support of Plaintiff's Motion for a Preliminary Injunction, filed the same day.  To avoid any confusion, plaintiff hereby incorporates and attaches by reference Exhibits A through P of the March 6, 2007 Appendix, and will cite those documents by their original exhibit numbers.

in Chicago, and to ensure that they appear for all required court dates.  *See infra* Part V.A.1.

Finally, the choice between separating plaintiff from her mother on the one hand, and her

continued detention at Hutto on the other, should be rejected by this Court because it effectively

nullifies plaintiff's rights under the *Flores* Settlement.  If plaintiff cannot assert her rights under

*Flores* without being separated from her mother—including but not limited to her right to release

from Hutto, if necessary—then key provisions of the Settlement are rendered virtually

meaningless for her.

      In response to plaintiffs' motion for preliminary relief, defendants raise various

objections, arguing principally that plaintiff has not satisfied *Flores* exhaustion requirements,

that the Settlement is not applicable to the family detention context, and that the Court has no

authority to grant the requested relief.  All of these arguments are without merit, as discussed

below.  Moreover, what defendants do not argue also speaks volumes.  Nowhere do defendants

identify their "prompt and continuous efforts" to release plaintiff, as required by the Settlement,

Ex. A ¶ 18; nowhere do they argue that Hutto is the "least restrictive setting" in which plaintiff

could be detained, *id*. ¶ 11; nowhere do they contend that the facility is properly licensed to

provide child care services, *id*. ¶ 6.  Defendants' silence on these issues underscores plaintiff's

likelihood of success on her claims that her confinement at Hutto violates her rights under the

*Flores* Settlement.  In addition, plaintiff's evidence that she suffers a significant risk of

irreparable harm from her continued confinement—based on declarations from three experts in

child psychology, and the anticipated testimony of Dr. Andrew Clark at the March 20, 2007

preliminary injunction hearing—is incontrovertible.  Plaintiff more than satisfies the

requirements for preliminary relief, and her request to be removed from Hutto with her mother

should be granted.

3

**Factual Background**

Defendants' lengthy "Facts" section misrepresents the reality of conditions at Hutto and the options available to defendants in lieu of detaining children in a prison-like environment, and advances other myths that are easily debunked by common sense.

Hutto is *not* good for families.  Defendants' brief and the declarations offered in support of it seem to portray Hutto as an ideal family residential environment.  In defendants' presentation, small prison cells become private family living areas; detainees in ICE custody become residents; and professional correctional officers who are not licensed child care providers become specially trained individuals who shepherd the mental, emotional, and social growth of the residents.  *See*, *e.g.*, Decl. Marc J. Moore ¶¶ 7-8, 14-17.  The mothers of the plaintiffs in these related actions reviewed the declarations submitted by defendants.  One representative reaction comes from Masomeh Alibegi, Kevin Yourdkhani's mother, who declares:

> I read the statements Mr. Marc Moore and Mr. Tim Perry made to the court.  When I realized how many of the things they said are not true I became very upset.  For example, Mr. Moore's statement says this is a family shelter and interior doors remain unlocked, facilitating maximum freedom of movement.  [Moore Declaration at ¶ 8].  That is just not true.  We cannot leave our pod ever except to eat and go to rec and then we are lined up like inmates and escorted by a guard, we are not even allowed to touch the door, much less open it ourselves and at night we cannot leave our cell.  The doors to our cells are not locked but no one is allowed to come out of their cells even for a second at night.  Family members who go into other family member's cells get in trouble.  That is not "freedom of movement," that is no freedom at all.

Decl. of Masomeh Alibegi, attached hereto as Ex. T ¶ 23.

There *are* cost-effective alternatives to detaining families at Hutto.  Defendants unfortunately perpetuate the myth that detaining families at Hutto is the only cost-effective

4

means of ensuring that such families will appear at their court hearings.  Defs.' Resp. at 7-8.  In truth, DHS has available to it less expensive and more humane ways to ensure that families comply with immigration laws, and in 2006, Congress directed DHS to expand its use of such alternatives.  The House Committee on Appropriations, when making appropriations to DHS, noted that "[p]rograms for electronic monitoring and telephonic reporting, and especially the Intensive Supervision Appearance Program (ISAP), contribute to more effective enforcement of immigration laws at far less cost ($22/night) than for detention ($95/night)."  Department of Homeland Security Appropriations Bill, H.R. 476, 109th Cong. (2006).[2]  In addition to ISAP and electronic monitoring, other placements—such as refugee shelters like Casa Marianella and release to family members—provide defendants with additional alternatives to Hutto.

        The ICE-DRO standards compliance process does *not* ensure that Hutto is an appropriate environment for children.  Defendants discuss the ICE Detention Standards and its compliance review process to assure the Court that Hutto is an appropriate environment for children.  *See* Defs.' Resp. at 9-11.  This is remarkable given that the ICE Detention Standards are entirely silent with respect to nearly every key provision of the *Flores* Settlement (*e.g.*, education, clothing, and individualized and special needs assessments), and in fact make little mention of the special considerations that arise when detaining children.  *See generally* ICE Detention Operations Manual (the "ICE Detention Standards"), *at* http://www.ice.gov/partners/dro/opsmanual/index.htm.  By way of contrast, the *Flores* Settlement sets forth a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS," Ex. A ¶ 9, and yet defendants have failed to adopt formal standards or

---

[2]        In its first full year, ISAP's overall success rate in eight cities—measured in terms of appearance at immigration proceedings—was 94 percent.  2006 DHS Appropriations Bill.  In one case, appearance rates were even higher: 98 percent.  *Id.*  Based on these findings, Congress recommended an additional $5 million for "this promising program" with the expectation that ISAP would be expanded to at least two more cities.  *Id.*

publish final regulations implementing the agreement for nearly *ten years*.  Moreover, defendants' declarant Timothy L. Perry makes clear that Hutto was last inspected in accordance to this compliance regime in July 2006—approximately ten months ago.[3]

Deterring child smuggling is *not* dependent on imprisoning children who are clearly not victims of smuggling.  Defendants provide absolutely no support for the assertion that detaining plaintiff is necessary to effectively combat child smuggling.  Plaintiff does not argue that defendants do not have the right to detain minors and adults in suitable, *Flores*-compliant locations while making a determination about identity and familial relationship.  But where, as here, there is no suggestion that child smuggling has occurred, defendants' repeated mention of child smuggling appears to be little more than fear mongering.

## Argument

### I.    Defendants Do Not Contest That the *Flores* Settlement Is Binding and Enforceable, and That Plaintiff Is a Class Member.

Defendants do not seriously dispute that *Flores* remains binding, that they have ongoing obligations under the Settlement, and that plaintiff is a member of the certified *Flores* Class. Defendants' discussion of the Supreme Court's 1993 decision in *Reno v. Flores*, 507 U.S. 292 (1993), while interesting for context, is not relevant to the scope of the 1997 Settlement or the parties' obligations under it.[4]  The 2001 Stipulation and Order clearly extends the terms of the

---

[3]        The Court has additional reason to be skeptical of ICE's ability to properly monitor conditions inside of its detention facilities.  A recent audit of five ICE detention facilities by the DHS Office of Inspector General identified at all five facilities "instances of non-compliance [with the ICE Detention Standards] regarding health care and general conditions of confinement that were not identified during the ICE annual inspection of the detention facilities."  DHS Office of Inspector General, *Treatment of Immigration Detainees Housed at Immigration and Customs Enforcement Facilities*, Dec. 2006, OIG-07-01, 36, *available at* http://www.dhs.gov/xoig/assets/mgmtrpts/OIG_07-01_Dec06.pdf.  It was this finding by the OIG that led to ICE's decision to incorporate the Office of Professional Responsibility into the agency's detention standards compliance regime.  *Id*. at 36-37.

[4]        It is also worth noting that although the Supreme Court in *Reno v. Flores* upheld INS regulations concerning the institutional custody of juveniles, the Court also emphasized throughout the decision that the treatment and conditions that children experienced in INS custody must meet minimum constitutional standards and

Settlement until defendants have published final regulations implementing those terms.  *See* Ex.

B, March 6 App.  Defendants did not, and cannot, claim to have done so.  Finally, as noted by

defendants, the withdrawal of the January 26, 2004 enforcement motion filed by the *Flores*

plaintiffs ended litigation on that particular motion, but did not terminate the *Flores* Settlement

or affect the ongoing enforceability of its provisions. Thus, there is no dispute that the Settlement

remains binding on defendants.

       While essentially conceding that the Settlement governs their actions with respect to the

incarceration of children at Hutto, defendants suggest that its terms are not applicable to

plaintiffs' claims because family detention facilities did not exist at the time the Settlement took

effect and because plaintiff is not an unaccompanied minor.  *See* Defs.' Resp. at 12.  These

observations do not alter the plain meaning of the Settlement provisions.[5]  The *Flores* Settlement

covers "[a]ll minors who are detained in the legal custody of the INS."  Ex. A ¶ 10.  Moreover,

notwithstanding their arguments that the Settlement is not applicable to claims regarding Hutto,

defendants acknowledge that they have made nominal efforts at compliance.  *See* Defs.' Resp. at

12 ("Nonetheless, ICE has worked to ensure that the Hutto facility is compliant with the relevant

aspects of the FSA.").  Indeed, before the facility opened on May 1, 2006, ICE Contracting

Officer Jan K. Wiser wrote to Judge John C. Doerfler of Williamson County,[6] identifying

numerous modifications that needed to be made to the Hutto facility and services "in accordance

with the Flores v. Reno Settlement Agreement."  Decl. of Vanita Gupta, attached hereto as Ex.

---

the requirements of the 1987 Memorandum of Understanding already entered into by the *Flores* parties.  *See, e.g.,* 507 U.S. at 305 ("Minimum standards must be met, and the child's fundamental rights must not be impaired . . . .").

[5]       However, the fact that there were no designated "family detention facilities" in 1997 does not mean that the INS was not detaining families with children at that time or that the Settlement was not intended to protect those children, as well as unaccompanied minors.  Whether or not the minors were accompanied by a parent was not material to the conditions issues raised in the *Flores* litigation, or to the need for specific standards to protect minors and ensure that the settings in which they are detained are appropriate to their age and special needs.

[6]       Williamson County owns the Hutto facility, which is operated by Corrections Corporation of America, Inc. (CCA), pursuant to a contractual arrangement with ICE.

Q, Attach. 2 at 1.   Many of these modifications were never made, but the letter reflects that from

the outset defendants have been aware of their obligations toward plaintiff under the Settlement.

**II.      Plaintiff Adequately Exhausted the Alternative Remedy Provided in Paragraph 24(E) of the *Flores* Settlement.**

Defendants argue that plaintiff failed to comply with the Settlement's requirement that

the parties confer telephonically or in person prior to filing any action in court.  Defendants'

argument—that plaintiff's counsel merely sent one letter to the United States Attorney's office

on February 21, 2007, and a second letter to the Department of Justice Office of Immigration

Litigation on March 1, 2007—is disingenuous at best.

In fact, the February 21, 2007 letter faxed to Johnny K. Sutton, U.S. Attorney for the

Western District of Texas, explicitly stated that it was sent in an attempt to informally confer

pursuant to Paragraph 24(E) Settlement.  *See* Ex. C, Attach. 2, March 6 App.  At noon on

February 22, plaintiff's counsel attempted to reach Mr. Sutton by telephone.  Ex. Q ¶ 3.

Plaintiff's counsel instead reached Mr. Sutton's voicemail and left a message notifying him of

the February 21 fax, and explaining that we represented several children detained at Hutto, that

we believed their detention violated the *Flores* settlement, and that we were reaching out to him

pursuant to a requirement in the settlement to see if we could resolve this matter without the need

for federal court intervention.  *Id*.  Mr. Sutton never returned that telephone call.  *Id*. ¶ 4.

Later that day, John Paniszczyn, Assistant U.S. Attorney for the Western District of

Texas, sent by facsimile a letter to plaintiff's counsel indicating that our February 21 letter had

been forwarded to Victor Lawrence at the Department of Justice Office of Immigration

Litigation.  *See* Ex. Q, Attach. 2.  The letter further stated that Mr. Lawrence would be handling

all further inquiries in this matter.  *Id*.  Unfortunately, because of a clerical error at the ACLU,

plaintiff's counsel did not receive Mr. Paniszczyn's facsimile until February 28.  By that time,

8

plaintiff's counsel had already called Mr. Sutton a second time—on February 27, 2007—in an effort to confer as required by Paragraph 24(E).  *See* Ex. Q ¶ 5.  Plaintiff's counsel again reached only Mr. Sutton's voicemail and again left a message.  *Id*.  Neither Mr. Sutton nor Mr. Lawrence returned that telephone message.  *Id*.  On March 1, plaintiff's counsel sent a letter to Mr. Lawrence, a copy of which was sent to Mr. Sutton.  *See* Ex. C, Attach. 3, March 6, 2007 App. This letter restated the substance of the February 21 facsimile, but added the names of several additional clients and requested written assurance from ICE that its officials would not retaliate against our clients for asserting their rights under *Flores*.  *Id*.  Plaintiff's counsel received no response to the March 1 letter.  Ex. Q ¶ 8.  Far from making no serious effort at conciliation, plaintiff's counsel repeatedly contacted Mr. Sutton and Mr. Lawrence, in writing and by telephone, over a period of eight days, and did not file any lawsuit under *Flores* until nearly two weeks passed without any substantive response whatsoever from opposing counsel.

In light of the failure of defendants' counsel to respond to repeated attempts to confer about plaintiff's claims under the Settlement, it was wholly reasonable for plaintiff's counsel to assume that additional efforts would be futile.  *See Parham v. Carrier Corp.*, 9 F.3d 383, 390-91 (5th Cir. 1993) (noting that a party may ordinarily bring suit prior to exhausting remedies if exhaustion would be futile and the party at least attempted to exhaust).  Indeed, the Court need look no further than defendants' own response brief to find evidence of such futility.  Defendants state clearly that had the parties conferred, defendants' position would have been that (1) the *Flores* Settlement does not apply to family detention centers; (2) plaintiff is mistaken about many of her allegations regarding Hutto; and (3) defendants are making changes to the Hutto facility to improve the environment.  *See* Defs.' Resp at 17.  Plaintiffs have satisfied the *Flores* exhaustion requirement.

**III.     The Applicable Standard of Review by this Court For All Claims is *De Novo*.**

As contemplated by Paragraph 24(B) of the Settlement, plaintiff challenges both the decision to place her in Hutto, and defendants' failure to comply with the standards set forth in Exhibit 1 of the *Flores* Settlement.  The standard of review for plaintiff's challenges to conditions in Hutto and defendants' failure to comply with Exhibit 1 of the Settlement is clearly *de novo* review.  Ex. A ¶ 24(C).  Defendants do not contest this.  *See* Defs.' Resp. at 11.

However, defendants mistakenly represent that the proper standard of review for plaintiff's challenge to defendants' placement decision is abuse of discretion.  *See id.* at 18. Paragraph 24(C) of the Settlement requires defendants to "provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility."  Ex. A ¶ 24(C).  This notice of reasons provides an explanation of ICE's exercise of discretion in making the placement decision, and the notice triggers judicial review under an abuse of discretion standard.  *Id*.  Without notice of the reasons for ICE's exercise of discretion in this manner, the Court need not—or rather, cannot—review the placement decision simply for abuse.  The proper standard of review is thus *de novo* in accordance with Paragraph 24(C).

Hutto is not a licensed program within the meaning of the *Flores* Settlement.  *See id*. ¶ 6. Nevertheless, defendants have provided none of the plaintiffs in these related matters with notice of the reasons for detaining them in a detention or medium security facility, rather than a licensed program.  *See* Decl. of Deka Warsame, attached hereto as Ex. R ¶ 5 ("Mohammed, Aisha, Bahja and I do not know why we are in jail.  We never received any notice of reasons for why the children are imprisoned here.  Mohammed tells me it is not fair for him to be in jail because he's never done anything wrong."); Decl. of Delourdes Verdieu, attached hereto as Ex. S ¶ 6 ("Neither my daughter nor I understand why we are in jail at Hutto.  We never received any

notice of reasons for why Sherona is being detained here.  Nobody told me or Sherona that this is

a good place with a license for taking care of children.  If someone told me that, I couldn't

believe it.  This is a bad place for children and mothers like Sherona and me."); Decl. of

Masomeh Alibegi, Ex. T ¶ 6 ("None of us understand why we are in jail at Hutto.  We never

received any notice of reasons for why Kevin, a Canadian citizen, is being detained here.  No one

ever told me this place has permission or a license to care for children.  I never saw a certificate

or papers that said this is a place for kids."); Decl. of Rasa Bunikiene, attached hereto as Ex. U ¶

5 ("The girls and I do not know why we are in jail.  We never got anything like a notice of

reasons for why the children are imprisoned here.  There was no real reason to detain them.  It

was absolute overexercising of power by ICE.  This place is not a place for children.  The guards

are mean to kids.  I don't think this place has any license for taking care of kids, it is a prison.");

Decl. of Raouitee Pamela Puran, attached hereto as Ex. V ¶ 7 ("Neither my daughter nor I

understand why we are in jail at Hutto. We never received any notice of reasons for why

Wesleyann is being detained here. This is a terrible jail, it's not for kids and parents.").

### IV.   This Court Has Authority To Enforce Plaintiff's Rights Under the Settlement By Ordering the Simultaneous Release of Both Plaintiff and Her Mother.

Defendants argue that Paragraph 24(B) of the Settlement does not authorize the Court to

enter an order affecting the claims of the plaintiff's adult relatives and therefore plaintiff's

request for simultaneous release with her mother must be denied.  *See* Defs.' Resp. at 12.

Plaintiff's mother, however, has not filed suit under *Flores*, and plaintiff brings no claims on her

behalf.  The only claims at issue here are plaintiff's own claims, which the Court clearly has

authority to address under Paragraph 24(B).  Plaintiff seeks preliminary relief consistent with

defendants' two most fundamental obligations under *Flores* toward minors in their custody: (1)

to preserve family unity through a general policy favoring release to a parent whenever possible,

11

*see* Ex. A ¶ 14; and (2) to house children in the least restrictive setting appropriate to their age and needs, *id*. ¶ 11.  *See also id*. ¶ 18 ("[T]he INS . . . shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above.").  Both obligations—to restore children to their families and to house them in the least restrictive environment—recognize the "particular vulnerability of minors" and reflect defendants' commitment to treat all minors in their custody "with dignity, respect and special concern."  *Id*. ¶ 11.  As a *Flores* class member, plaintiff is entitled to the benefits of both of these protections under the Settlement.

The Flores Stipulated Settlement is a court-approved contract, and plaintiff raises contract claims.  *See United States v. ITT Continental Baking Co*., 420 U.S. 223, 236 (1975) (holding that consent decrees and orders should be construed in the same manner as contracts); *Guidry v. Halliburton Geophysical Services, Inc*., 976 F.2d 938, 940 (5th Cir. 1992).  Federal common law principles govern the interpretation of contracts to which the United States is a party, as in this case.  *Boyle v. United Technologies Corp*., 487 U.S. 500, 504 (1988).  A fundamental principle of contract interpretation is that a contract "should be interpreted as to give meaning to all of its terms—presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous."  *Transnat'l Learning Cmty. at Galveston, Inc. v. United States Office of Pers. Mgmt.*, 220 F.3d 427, 431 (5th Cir. 2000).  Moreover, when interpreting a contract, courts are compelled to give effect to the parties' intentions.  *Pennzoil Co. v. FERC*, 645 F.2d 360, 388 (5th Cir. 1981).  In light of these principles, the *Flores* Settlement must be interpreted to give meaning to both key protections afforded by and intended under the Settlement.  For minors with detained parents, such as plaintiff, this means that the *Flores* Settlement must be interpreted to permit the court to order the release of the minor *with* his or her detained parent

from conditions that violate the Settlement, otherwise the minor's right to be housed in *Flores*-compliant conditions is nullified and rendered meaningless.  Conversely, if the minor is released from a non-compliant setting without his or her detained parent, then the minor's right to be unified with her parent is eviscerated.

The draconian choice presented by these alternatives is artificial and entirely unnecessary given defendants' clear statutory authority to release plaintiff's mother.  *See* 8 U.S.C. § 1182(d)(5)(A) (authorizing discretionary parole "for urgent humanitarian reasons or significant public benefit" of non-citizens seeking admission); 8 U.S.C. § 1226 (authorizing release of inadmissible and deportable non-citizens pending a determination of removability).  Indeed, the simultaneous release of minors such as plaintiff with their detained parents is explicitly contemplated by regulations.  *See* 8 C.F.R. § 212.5(b)(3)(ii) (authorizing the release from detention of both a minor *and* the minor's accompanying relative); 8 C.F.R. § 236.3(b)(2) (same).  Moreover, the authority to release a minor along with her detained parent—and even the wisdom of doing so—is specifically noted in the opening paragraph of the Supreme Court's opinion in *Reno v. Flores*, where the Court writes:

> The Board of Immigration Appeals has stated that "[a]n alien generally . . . should not be detained or required to post bond except on a finding that he is a threat to the national security . . . or that he is a poor bail risk."  In the case of arrested alien juveniles, however, the INS cannot simply send them off into the night on bond or recognizance.  The parties to the present suit agree that the Service must assure itself that someone will care for those minors pending resolution of their deportation proceedings.  *That is easily done when the juvenile's parents have also been detained and the family can be released together*; it becomes complicated when the juvenile is arrested alone, *i.e.*, unaccompanied by a parent, guardian, or other related adult.

507 U.S. 292, 295 (1993) (internal citations omitted) (emphasis added).

In sum, this Court has authority to issue an order protecting the rights of the child under the Settlement and giving effect to its terms—in this case, an order that plaintiff be released along with her mother.  Paragraph 24(B) does not say that the district court cannot enter an order affecting anyone other than plaintiff; it says that the district court's order must solely affect the "individual claims of the minor bringing the action."  Ex. A ¶ 24(B).  Nothing whatsoever prevents the Court from ordering simultaneous release of the child with the parent, if necessary to resolve plaintiff's individual claims under the Settlement.  In the alternative, the Court certainly has authority to order defendants to show cause why plaintiff's mother cannot be released with her under reasonable conditions of supervision or to a less restrictive, home-like environment, given defendants' clear statutory authority to do so.

**V.      Plaintiff Satisfies the Requirements for a Preliminary Injunction.**

Plaintiff demonstrates in her motion that she meets each of the requirements for a preliminary injunction.  Defendants argue that plaintiff fails to meet even one of the four requirements.  Defendants' arguments fail for the following reasons.

**A.  Plaintiff is likely to succeed on her claims that defendants are in violation of the *Flores* settlement.**

1.  Hutto is not the least restrictive setting appropriate for plaintiff.

Defendants make countless claims about the conditions inside the Hutto facility, but one claim they never make is that Hutto is the least restrictive setting appropriate for plaintiff. Defendants concede that Hutto is "a former state prison," but argue that "[t]here are no physical barriers to movement within the facility."  *See* Defs.' Resp. at 23.  The experiences of plaintiff and her mother and sister at Hutto belie defendants' contentions.

Plaintiff's mother, Rasa Bunikiene, describes the experience this way:

> A jail is a jail no matter what. Barred doors were covered with drywall only a few weeks ago. There are long corridors without windows. Guards interrupt us when we use the bathroom. I can only see the sun shining through a window that is three inches wide. There are prison bars everywhere. Every step that we take is controlled by guards. We cannot open doors without the guards, we cannot enter a corridor without the guards. Each of our movements is monitored. We can't leave our pod without supervision. This place is a prison.

Ex. U ¶ 21.

Plaintiff's expert in child psychiatry, Dr. Andrew Clark, M.D., toured the Hutto facility for three hours on March 15, 2007, pursuant to this Court's Order dated March 13, 2007. In addition to being an Instructor in Psychiatry at Harvard Medical School and the former Medical Director of the Children and the Law Program at Massachusetts General Hospital, Dr. Clark holds a part-time position as the Director of Psychiatric Services at the Suffolk County House of Correction at South Bay. At the hearing scheduled for March 20, 2007, Dr. Clark will testify that despite being named a family residential center, there is no question but that Hutto is a correctional facility. In Dr. Clark's opinion, Hutto is a correctional facility not only in appearance, but also in the manner in which it is operated; families live in cells, the physical plant itself is bleak, and prison officials retain control over all aspects of life within the facility.

Moreover, Hutto clearly is not the least restrictive setting in which plaintiff could be housed because plaintiff has herself identified an alternative to detention that is currently available to her. Plaintiff's stepfather, Paul H. Velazquez, is a U.S. citizen and is eager to care for and support his stepdaughters and his wife in his home in Chicago, Illinois. Mr. Velazquez is prepared to ensure that they comply with all laws governing their immigration proceedings, which are pending in Chicago immigration court. In accordance with Paragraph 15 of the *Flores* Settlement, Mr. Velazquez has executed an Affidavit of Support (Form I-134) for plaintiff. *See*

Ex. W.  In that affidavit, Mr. Velazquez guarantees that he is "willing and able to receive,

maintain and support" plaintiff and that she will not "become a public charge during ... her stay

in the United States."

Neither plaintiff or her mother or sister poses any danger to society that would require

them to be detained at Hutto.  Defendants face no legal constraints that would encumber

plaintiff's release to her stepfather.  The release of plaintiff with her mother and her sister in

accordance with this plan would be consistent with the *Flores* policy favoring the release of

minors to their family members in the United States.  Moreover, plaintiff would be afforded care,

comfort, and freedom of movement if released to her stepfather with her mother and her sister,

making this the least restrictive setting appropriate for this nine-year-old child's needs.

### 2.  Hutto is not a licensed program.

According to the *Flores* Settlement, when ICE chooses not to release a minor in

accordance with Paragraph 14 of the Settlement, the minor "shall be placed" in a licensed

program.  Ex. A ¶ 19.  A licensed program is "any program, agency or organization that is

licensed by an appropriate State agency to provide residential, group, or foster care services for

dependent children, including a program operating group homes, foster homes, or facilities for

special needs minors."  *Id*. ¶ 6.  Failure to place a minor in such a facility can be excused in only

two types of extraordinary circumstances, neither of which pertains to the plaintiff.  *See id*. ¶¶

12, 21.  Notwithstanding the clear requirements of the *Flores* Settlement, defendants essentially

concede that Hutto is not a licensed program.  Marc J. Moore, Field Office Director for ICE's

San Antonio DRO Field Office, refers to modifications that were made to the prison, describes

Hutto as "a family shelter facility" and applauds its "family-friendly nature," but he never

affirms that the facility obtained a license by an appropriate State agency to provide residential,

group, or foster care services to the children detained at Hutto.  *See generally* Decl. of Marc J. Moore ¶¶ 7-8.

Obtaining child-care licensing is important for many reasons.  As just one example, because Hutto is not licensed, children must remain in the company of their parents at all times unless they are in class.  This prevents parents from speaking with attorneys, medical personnel, and visitors without their children in the room.  In some instances, this failure results in children being forced to listen to their parents' accounts of torture and persecution, which can be unnecessarily traumatic.  *See* Ex. T ¶ 16 ("When my husband and I met with our attorney, Kevin heard for the first time graphic details of how my husband and I were tortured in Iran.  We had no choice because, at Hutto, all children must be with their parents, even during attorney-client interviews.  Kevin was not allowed to play with toys or markers or anything during the interview; nothing distracted his attention from hearing the horrible things that Majid and I have suffered.").

3.  <u>Hutto does not comply with the standards set forth in Exhibit 1 to the *Flores* Settlement.</u>

Defendants appear to offer no defense to many of plaintiff's claims that Hutto fails to comply with Exhibit 1 of the *Flores* Settlement.  For instance, defendants do not claim to have conducted an individualized needs assessment of plaintiff as required by the Settlement.  Ex. A, Ex. 1, ¶ A(3).  They do not claim that plaintiff may wear her own clothing where available.[7]  *Id.* ¶ A(12).  They do not contend that individual or group counseling sessions are provided for the children at Hutto, or that specific acculturation or adaptation services are provided to assist in

---

[7]      By way of contrast, children at the Berks County Detention Center are permitted to wear the clothing they had with them when they were apprehended, they are able to purchase additional clothing during field trips to stores such as Wal-Mart, and they receive additional clothing donated to the families at the facility.  *See Locking up Family Values: The Detention of Immigrant Families*, Women's Commission for Refugee Women and Children and Lutheran Immigration and Refugee Service, Decl. of Vanita Gupta, Ex. C, Attach. 1, March 6 App., at 15.

their development.  *See id.* ¶¶ A(6)-A(8).  Defendants also do not claim that plaintiff may have contact visits with non-detained family members, nor do they assure a reasonable right to privacy that includes the private use of the telephone and the right to receive and send uncensored mail. *See id.* ¶¶ A(11)-A(12).

Even in those areas in which defendants claim to be meeting the requirements of Exhibit 1 to the *Flores* Settlement, plaintiff's evidence—without the benefit of discovery—demonstrates a likelihood of success on the merits.  Defendants' conclusory statements about the quality of medical and mental health care provided to children at Hutto are directly contradicted by the experiences of plaintiff and her family, and by the opinions of plaintiff's experts who have reviewed the declarations of children and adults at Hutto.  Dr. Jack Saul, Ph.D., a licensed psychologist with over 25 years experience practicing as a child and family psychotherapist and trauma specialist, found numerous examples in the declarations of "severe neglect and psychological maltreatment" of children at Hutto, including "lack of access to and delay in receiving adequate medical and dental care" and the failure to provide counseling.  Decl. of Jack Saul, Ph.D., attached hereto as Ex. X ¶ 6.  Dr. Clark not only toured Hutto, but he also spoke with several former detainees at the facility, including Elsa Carbajal and her two children, both of whom filed actions under *Flores* prior to being released from Hutto.  On March 20, 2007, Dr. Clark will testify that Hutto is psychologically and emotionally devastating to the children detained there.  Plaintiff is likely to demonstrate that defendants significantly fail to comply with the standards set forth in Exhibit 1 to the Settlement.

### B.  Plaintiff has already suffered and will continue to suffer irreparable harm from her detention at Hutto.

Based on his prodigious experience in the areas of child psychiatry and trauma, his years of working with juveniles in the criminal justice system, and his conversations with several

18

recently released Hutto detainees, Dr. Clark will testify on March 20 that even a brief incarceration in Hutto can be expected to cause a high level of post-traumatic stress and depressive psychopathology in children, and that many of the children with whom he met showed signs of suffering harm that either will not soon be forgotten or that has already had a permanent effect.

Dr. Saul similarly observes that:

> [e]ven the most minimal experience of imprisonment may cause needless frustration, acute anxiety, fear and depression in children and adults. . . . The placing of children and adults who have endured severe traumatic events . . . in an environment that further disempowers them and prevents them from having a modicum of control over their daily lives is injurious and increases the risk factors for future mental health disorders.

Ex. X ¶ 3.  After reviewing numerous declarations prepared in connection with this case and the related cases, Dr. Saul identified many examples of "*physical, educational and emotional neglect on the part of prison authorities,*" *id*. ¶ 6 (emphasis in original), and concluded that:

> [a]s a mandated reporter of suspected cases of child abuse and maltreatment in the State of New York, if I were to receive statements by parents and children similar to those I have read from Hutto Prison, I would be legally required to report such an institution to Child Protective Services that would lead to an investigation of child abuse.

*Id*.

The opinions of Dr. Clark and Dr. Saul find further support in the Declaration of John Sargent, M.D. and the Declaration of David R. Blackburn, Ph.D., which were offered at the time plaintiff initially moved for a preliminary injunction.  *See* Exs. E and F, March 6 App.  Both Dr. Sargent and Dr. Blackburn opined that being held in a prison-like setting such as Hutto, even for a short period of time, can be psychologically traumatic to a child.  *See* Ex. E ¶ 3; Ex. F ¶ 4. Plaintiff has established irreparable harm.

19

### C.  The balance of harms and the public interest overwhelmingly favor plaintiff's requested relief.

Defendants contend that granting plaintiff preliminary injunctive relief will effectively undermine ICE policies designed to protect children from the dangers of international smuggling operations.  *See* Defs.' Resp. at 24.  Defendants' argument is illogical and makes little sense. There has been no suggestion that defendants question the identity of plaintiff or her mother, or have reason to suspect that she is a victim of child smuggling.  Defendants offer no explanation as to how the release of a child who is not suspected of being a smuggling victim could have any effect on the temporary detention of adults and minors who are suspected of being involved in smuggling.  Given that defendants have failed to explain how their efforts to protect children from the dangers of smuggling operations is advanced by continuing to detain plaintiff in a medium-security prison where she is suffering very real and lasting injury each day, the balance of harms clearly favors plaintiff.[8]  Moreover, even assuming that the imprisonment of children who have not been smuggled into this country *were* an effective deterrent to smuggling and that deterrence is a legitimate goal, there is no legal or moral justification for violating the plaintiff's rights under the Settlement to accomplish that goal.

### VI.  Plaintiff Is Entitled to Additional Discovery If the Court Finds She Has Not Met Her Evidentiary Burden.

Should the Court conclude that the evidence presented by plaintiff in her filed papers and at the March 20, 2007 hearing is insufficient to meet the burden of proof required for the Court to order the requested preliminary relief, plaintiff is entitled to additional discovery.  While plaintiff has supplied an ample record that establishes a significant threat of irreparable harm due

---

[8]     Defendants also argue that the balance of harms favors continued family detention because the only alternative for plaintiff is placement in an ORR facility and separation from her mother.  *See* Defs.' Resp. at 24-25. Plaintiff has already demonstrated that simultaneous release of plaintiff and her mother is within ICE's statutory authority, is specifically permitted by the agency's own regulations, and can be accomplished in a manner that will ensure plaintiff and her family appear at all court hearings.  *See supra* Parts IV and V.A.1.

to her ongoing detention at Hutto, she has not had the opportunity to be evaluated by a psychology expert or to have a conditions expert evaluate her living conditions.  A psychological expert evaluation that is based on interviews with plaintiff and a review of her institutional records, such as medical and educational records, is critical to a full assessment of the irreparable harm that she may suffer at Hutto.  Furthermore, the evaluation of a conditions expert who has been able to meet with plaintiff as well as tour the facility and speak to ICE and CCA officials operating the facility would provide vital information required to establish the likelihood of success on several of the claims in plaintiff's Complaint.  This evaluation would provide a full assessment of the "suitability" of her living conditions, *see* Ex. A, Ex. 1 ¶ A(1), and the "appropriateness" of medical, mental health, and educational services, among other conditions that are the subject of plaintiff's complaint, *id*. at ¶¶ A(2), A(4).  A lack of such individualized and relevant information may leave the Court without sufficient information to evaluate the merits of plaintiff's request for preliminary relief; if so, plaintiff is entitled the additional discovery.

## Conclusion

For the reasons set forth above, plaintiff's Motion for a Preliminary Injunction Ordering Her Immediate Release From Hutto With Her Mother should be granted.

Dated: March 19, 2007.

Respectfully submitted,

/s/ Lisa Graybill_____

Lisa Graybill
Texas State Bar No. 24054454
AMERICAN CIVIL LIBERTIES UNION
OF TEXAS
P.O. Box 12905
Austin, TX 78711

Telephone: (512) 478-7300
Fax: (512) 478-7303
Email: lgraybill@aclutx.org

Barbara Hines
Texas State Bar No. 09690800
Director – Immigration Clinic
THE UNIVERSITY OF TEXAS SCHOOL
OF LAW
727 E. Dean Keeton Street
Austin, TX 78705
Telephone: (512) 232-1310
Fax: (512) 232-9171
Email: bhines@law.utexas.edu

Vanita Gupta*
Elora Mukherjee*
Dennis Parker*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION – Racial Justice Program
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500

Gouri Bhat*
Tom-Tsvi M. Jawetz*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION – National Prison Project
915 15th Street, NW, 7th Floor
Washington, DC 20005
Telephone: (202) 393-4930

Judy Rabinovitz*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION – Immigrants' Rights
Project
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2500

Sean Gorman
Stephen J. Lable*
LEBOEUF, LAMB, GREENE &
MACRAE, LLP

Reliant Energy Plaza
1000 Main Street, Suite 2550
Houston, TX 77002
Telephone: (713) 287-2000

* indicates *pro hac vice* motion pending

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on March 19, 2007, I electronically filed the foregoing document with the Clerk of the Court using the ECF system.  The ECF system will send notification of this filing to the following person:

Victor M. Lawrence
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, DC  20044
Telephone: (202) 305-8708
Email: <u>victor.lawrence@usdoj.gov</u>

      I further certify that on March 19, 2007, a copy of the foregoing document was delivered by electronic mail to the following person:

Edward E. Wiggers
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, DC  20044
Telephone: (202) 616-1247
Email: <u>edward.wiggers@usdoj.gov</u>

                        /s/ Lisa Graybill_____

                        Lisa Graybill
                        Texas State Bar No. 24054454
                        AMERICAN CIVIL LIBERTIES UNION
                        OF TEXAS
                        P.O. Box 12905
                        Austin, TX 78711
                        Telephone: (512) 478-7300
                        Fax:  (512) 478-7303
                        Email: <u>lgraybill@aclutx.org</u>