## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

FILED

APR 9 2007

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY CLERK

SAULE BUNIKYTE, by
and through his next friend and mother,
Rasa Bunikiene,
                    Plaintiff,

-vs-                                                Case No.  A-07-CA-164-SS

MICHAEL   CHERTOFF,  Secretary  of  U.S.
Department of Homeland Security; et al.,
                    Defendants.

SHERONA VERDIEU, by
and through her next friend and mother,
Delourdes Verdieu,
                    Plaintiff,

EGLE BAUBONYTE, by
and through her next friend and mother,
Rasa Bunikiene,
                    Plaintiff,

-vs-                                                Case No.  A-07-CA-165-SS

MICHAEL   CHERTOFF,  Secretary  of  U.S.
Department of Homeland Security; et al.,
                    Defendants.

SHERONA VERDIEU, by
and through her next friend and mother,
Delourdes Verdieu,
                    Plaintiff,

-vs-                                                Case No.  A-07-CA-166-SS

MICHAEL   CHERTOFF,  Secretary  of  U.S.
Department of Homeland Security; et al.,
                    Defendants.

## O R D E R

BE IT REMEMBERED on the ___9th___ day of April 2007 the Court held a hearing in the

above-styled causes,[1] and the parties appeared through counsel.  Before the Court were Plaintiffs'

Motions for Preliminary Injunction, Defendants' Responses thereto, and Plaintiffs' Replies.

After considering these documents, the arguments of counsel at the hearing, the applicable law,

and the case file as a whole, the Court sought supplemental briefing and evidence on certain

issues related to Plaintiffs' request for preliminary relief.  Having considered the supplemental

briefing filed by Plaintiffs and Defendants, the Court now enters the following opinion and

orders.

## Background

Plaintiffs are minor children who entered the United States illegally with their parents and

were apprehended by Immigration and Customs Enforcement ("ICE") and the Department of

Homeland Security ("DHS").  Plaintiffs and their parents, who are seeking political asylum from

various countries,[2] have been detained at the Don T. Hutto Family Residential Center ("Hutto") in

Taylor, Texas during their immigration proceedings.

Hutto is only the second family detention center in the United States.  The first, in Berks

County, Pennsylvania, was built in 2001 from a converted nursing home.  Hutto, in contrast, is a

converted medium-security prison.  Hutto has been in operation since May of 2006.  It was initially

used to house only families who were candidates for expedited removal, but now also houses

detainee families not subject to expedited removal.  The average stay of a Hutto resident subject to

---

[1] The hearing concerned eight related cases; however, the complaints filed by Wesleyann Emptage, Mohammed Ibrahim, Bahja Ibrahim, Aisha Ibrahim, and Kevin Yourdkhani have since been voluntarily dismissed because each of these Plaintiffs has been released from Hutto as a result of bond, parole, or the conclusion of immigration proceedings.

[2] Two of the remaining Plaintiffs in the related cases, Saule Bunikyte and Egle Baubonyte, state that they wish to apply for asylum but have been prevented from filing asylum applications by ineffective assistance of counsel to date.

expedited removal is 20 days, while the average stay of one not subject to expedited removal is 50 days. Resp. 13–14. Most of the Plaintiffs, however, have exceeded the longest average stay by quite a bit. The Verdieu family, for example, had been detained for 176 days before filing suit.

Hutto is the product of a relatively recent shift in immigration policy. Prior to 2001, families apprehended for entering the United States illegally were most often released rather than detained because of a limited amount of family bed space; families who were detained had to be housed separately, splitting up parents and children. Perry Affid. ¶ 6. In the wake of September 11, 2001, however, immigration policy fundamentally changed.[3] The current policy of more restrictive immigration controls, tougher enforcement, and broader expedited removal of illegal aliens has made the automatic release of families problematic. DHS initially responded by detaining more family groups, placing adults in ICE holding facilities and placing alien minors into separate ORR custody. DHS argued this was necessary because alien smugglers had begun "renting" children to travel with illegally entering adults in hopes of passing the groups off as "families" and thus avoiding detention under the automatic-family-release policy. Id.

Though separate detention of minors may have removed some children from dangerous smuggling situations, it often had the effect of splitting up legitimate family groups. In 2005, Congress rejected this approach, stating

Children who are apprehended by DHS while in the company of their parents are not in fact

---

[3] In order to implement policy changes regarding immigration, Congress passed the Homeland Security Act in 2001, splitting the function of the Immigration and Naturalization Service (INS) into three separate agencies and placing all three agencies under the jurisdiction of the Department of Homeland Security (DHS). The Act transferred responsibility for the care and custody of unaccompanied alien children to the Department of Health and Human Services' Office of Refugee Resettlement (ORR).

--

3

'unaccompanied' and if their welfare is not at issue, they should not be placed in ORR custody.  The committee expects DHS to release families or use alternatives to detention such as the Intensive Supervised Appearance Program whenever possible.  When detention of family units is necessary, the Committee directs DHS to use appropriate detention space to house them together.

House Committee on Appropriations, *Department of Homeland Security Appropriations Bill, 2006: report together with additional views (to accompany H.R. 2360)*, 109th Cong., 1st Session, 2005, H. Rep. 109-79.

Despite Congress' expressed preference for family release "whenever possible," DHS is reluctant to return to a policy of automatically releasing family groups.  DHS argues that automatic release of families encourages parents to subject their children to the dangers of illegal immigration. Therefore, in addition to experimenting with the ISAP program (an electronic monitoring program currently in use in nine pilot locations, none of which are in or near Texas),  DHS has begun to explore the use of "Family Detention Centers" designed to house family groups together. Mot. Prel. Inj. Ex. C, Attachment 1: Women's Commission Report: *Locking Up Family Values: the Detention of Immigrant Families* n.12.  As discussed above, Hutto is the second of only two family detention centers currently operating in the United States.

The minor Plaintiffs allege their detention in Hutto violates the terms of a class action settlement agreement entered in *Flores v. Meese*, No. 85-cv-4544 (C.D. Cal. September 16, 1996) (the "*Flores* settlement"), which "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the [Immigration and Naturalization Services] INS and . . . supersede[s] all previous INS policies that are inconsistent with the terms of this Agreement." *Flores* Settlement ¶ 9, Mot. Prel. Inj. Ex. A.  The *Flores* settlement is binding on ICE and DHS as successor organizations to INS. *Flores* Settlement ¶ 1.

4

Of course, the provisions of this settlement agreement, entered over ten years ago, were never intended to be permanent authority, much less the *only* binding authority setting standards for the detention of minor aliens. The *Flores* Settlement was intended as a stopgap measure until the United States could promulgate reasonable, binding standards for the detention of minor in immigration custody. *Flores* remains in force until "45 days following defendants' publication of final regulations implementing this Agreement." Stipulated Order Extending Settlement Agreement, Mot. Prel. Inj. Ex. B. Yet the United States does not contest that the *Flores* settlement is still in effect. Despite the passage of just over a decade, neither DHS nor Congress has yet promulgated binding rules regarding standards for the detention of minors. In fact, it appears that *Flores* is the only binding legal standard directly applicable to the detention of minor aliens by the United States government, despite the passage of time and the drastic changes in immigration policy since this judgment was first entered.

Though it is no defense that the *Flores* Settlement is outdated, it is apparent that this agreement did not anticipate the current emphasis on family detention, where the parole of adult family members is limited by acts of Congress or the judicial branch. Since its inception in 2001, family detention has been governed by *ad hoc* policies DHS derives from a combination of DHS's Detention Operations Manual, an internal standards guide that is not codified by statute or incorporated into regulation, and the *Flores* Settlement. Women's Commission Report 8. Neither the Detention Operations Manual nor the *Flores* Settlement addresses the concerns specific to family detention: the Detention Operations Manual is largely derived from American Correctional Association standards for the custody of adult criminal inmates, while the *Flores* Settlement was the result of litigation regarding unaccompanied minors, not minors in a family group. *Id.*

5

Nonetheless, the *Flores* Settlement, by its terms, applies to all "minors in the custody" of ICE and DHS, not just unaccompanied minors. *Flores* Settlement, ¶ 9. The Settlement expresses a policy preference for the release of minors where possible, and sets out standards for the conditions of detention where release is not available. Under Paragraph 14 of the *Flores* settlement, if ICE or DHS determines the detention of a minor is not required to secure his or her appearance in immigration proceedings or for safety reasons, the minor "shall be released from custody without unnecessary to delay" to (in order of preference): a parent, a legal guardian, an adult relative, an adult designated by the child's parent, a licensed program willing to accept legal custody, or an adult individual or entity seeking custody (if family reunification appears impossible). Of course, this preference for release makes no sense when the minor's parents are detained with the child. Plaintiffs and Defendants agree that separating the minor Plaintiffs from their parents by releasing the children to adult relatives would be traumatizing and detrimental to them.

Though the release policy expressed in Paragraph 14 has limited utility in the context of family detention, Paragraph 19 sets out the foundation of the detention standards applicable to any minor in United States immigration custody, and there is no reason why its requirements should be any less applicable in a family detention context than in the context of unaccompanied minors. Paragraph 19 requires that any minor not released from custody under Paragraph 14 must be housed in a "licensed program" until such time as release can be effected or until the minor's immigration proceedings are concluded. A "licensed program" is a program that is (1) licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, (2) is "non-secure as required by State law," and that (3) meets standards of medical care, education, supervision, and nutrition described in Exhibit 1 of the *Flores* settlement. *Flores* settlement ¶6.

The *Flores* settlement provides that a minor may be held in a "secure facility" (as opposed to a "licensed program") only if the minor (1) has been charged or "is chargeable" with a crime or delinquency other than an isolated or petty offense, (2) has committed or threatened violence to himself or others while in INS custody, (3) has engaged in disruptive conduct like drug abuse, stealing, or intimidation of other children while in a licensed program, (4) is an escape risk or (5) would be in danger unless kept in a secure facility. *Flores* settlement ¶ 21. A minor "will not"be placed in a secure facility under Paragraph 21 if there are less restrictive options available such as a medium security facility or licensed program. *Flores* settlement ¶ 23. A "medium security facility," like a "licensed program," must be licensed to provide residential, group, or foster care child services under State law and must be in compliance with the standards set out in Exhibit 1 of the *Flores* settlement. *Flores* settlement ¶ 8. All decisions to place minor in secure facility must be reviewed and approved by a regional juvenile coordinator. *Flores* settlement ¶ 23.

Paragraph 24 of the *Flores* settlement provides for judicial review of ICE's detention of minors. Under Paragraph 24(a), a minor in deportation proceedings "shall be afforded a bond redetermination hearing before an immigration judge in every case." Several of the Plaintiffs in these related cases, however, are not eligible for bond because ICE has classified them as "arriving aliens." Under 8 C.F.R. § 1003.19(h)(2)(i)(B), immigration judges are without jurisdiction to review ICE's custody determinations for "arriving aliens in removal proceedings."

Regardless, Paragraph 24(b)provides that any individual child may bring suit in any Federal District Court to (1) challenge ICE's placement determination or (2) allege the facility in which he is detained is not in compliance with the standards in Exhibit 1 of the *Flores* agreement. Paragraph 24(c) provides that judicial review of a placement decision will be under an abuse of discretion

7

standard, while judicial review of a facility's compliance with *Flores* Exhibit 1 standards is de novo. Paragraph 24(c) also requires Defendants to provide minors not placed in licensed programs with "notice of the reasons for housing the minor in a detention or medium security facility." Plaintiffs sue under both prongs of Paragraph 24(b), alleging Defendants have abused their discretion in placing them in the Hutto facility, which is not a licensed program, and further alleging the Hutto facility is not in compliance with Exhibit 1 standards.

As discussed above, the Hutto facility is a converted medium security prison. It is operated by the Corrections Corporation of America ("CCA"), a private operator of prisons. Hutto has been in operation since May 2006, and is not licensed to provide residential, group, or foster care services for dependent children by the State of Texas or any other state. However, the Hutto facility applied for and was granted a licensing exemption from the State of Texas based on CCA's representation that children in Hutto remain in the care of their parents or legal guardians while they are detained. Def.'s Status Report, Decl. Marc Moore, Attachment.

Plaintiffs and Defendants offer conflicting accounts of conditions within the Hutto facility. Plaintiffs describe unreasonably cold rooms, inadequate medical care, substandard food, and psychologically abusive guards. Plaintiffs further assert the facility is run like a prison: there is 24/7 camera surveillance of residents in both communal and personal living areas, the residents are escorted everywhere within the facility and are not allowed to move from one area to another by themselves, the facility has a secure perimeter, and no contact visits are allowed. Plaintiffs allege the guards discipline children at Hutto by threatening to separate them from their parents. Plaintiffs' expert, Dr. Andrew Clark, interviewed five children recently released in Hutto. Dr. Clark testified these children had experienced weight loss, bed wetting, nightmares as a result of stress from

incarceration.

Defendants assert the level of care and nutrition at Hutto is excellent and that Hutto is continuing to modify and improve its policies. For example, parents were initially required to attend school with their children, which resulted in "limited school hours" (which translates as "one hour of instruction per day") because of space constraints. In January, parents were no longer required to supervise school hours, which allowed the Hutto facility to increase its program to five hours of classroom time, one hour of recreation, and one hour of lunch. In response to complaints about food, Hutto performed a survey of the residents, changed the menu, and provided open-access refrigerators filled with fruit and other snacks in the dorms. Hutto has also modified its policy regarding contact visits and now allows limited, supervised contact visitation.

Plaintiffs seek a preliminary injunction ordering their release from Hutto and the simultaneous release of their parents. Plaintiffs also seek a preliminary injunction ordering access to them and their medical records for their expert witnesses. Plaintiffs ultimately seek a declaratory judgment that the *Flores* settlement is binding and enforceable, and a permanent injunction ordering Defendants to comply with the provisions of the *Flores* Settlement with respect to each Plaintiff. Defendants assert Plaintiffs are not entitled these remedies.

## Analysis

## I. Exhaustion

As a threshold matter, Defendants assert Plaintiffs' suit is barred because they have failed to comply with the "informal resolution" procedure mandated by the *Flores* Settlement. The Flores Settlement requires Plaintiffs' counsel to "confer telephonically or in person with the United States Attorney's Office for the district in which an action is to be filed" to attempt an informal resolution

9

of the complaint before filing suit. *Flores* ¶ 24. The United States claims Plaintiffs have not

complied with this "exhaustion" provision. However, Plaintiffs have produced affidavits and records

of correspondence showing that, on February 21 and 22, 2007, counsel for Plaintiffs faxed a letter

and called the United States Attorney for the Western District of Texas, the Honorable Johnny

Sutton, attempting informal resolution of their claims.  The United States Attorney's Office

informed Plaintiffs the matter had been transferred to Victor Lawrence in the Washington, DC Office

of Immigration Litigation.  Plaintiffs sent a letter to Lawrence on March 1, 2007, again attempting

informal resolution, but did not attempt to telephone him.  Lawrence did not attempt to contact

Plaintiffs in response to either the March 1, 2006 letter or the February letter and calls to Mr. Sutton,

which had been forwarded to him.  Lawrence asserts he thought any attempt at negotiation would

be futile in light of Plaintiffs' March 2, 2007 "embargoed" press release announcing the forthcoming

filing of these lawsuits on March 6, 2007.

From the pleadings and evidence on file, and particularly from the attitude of the parties and

counsel at the hearing, it is evident that Plaintiffs sought to file this lawsuit as soon as possible to

garner maximum attention from the press.  It is equally evident that neither side is interested in

reaching any conciliatory agreement even now, let alone prior to filing suit.  Nevertheless, though

both parties could have made better efforts to confer prior to this litigation, it appears Plaintiffs have

literally complied with paragraph 24's requirement by telephoning the United States Attorney's

Office in the Western District at least twice to attempt informal resolution prior to filing suit.

Moreover, they have complied with the spirit of paragraph 24.  Plaintiffs have shown they faxed

letters seeking informal resolution of Plaintiffs' complaints to both Mr. Sutton and Mr. Lawrence

over a period of approximately two weeks before filing suit.  During those two weeks, the United

States never substantively responded to any of Plaintiffs' overtures.  Paragraph 24 is intended to encourage both parties to make good faith efforts to resolve complaints; it is not intended to allow the United States to avoid legitimate suits by simply refusing to return correspondence.  Paragraph 24 is no bar to Plaintiffs' suit.

## II. Preliminary Injunction Standard

To obtain a preliminary injunction, plaintiffs must show (1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest. *Planned Parenthood v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005).   A preliminary injunction is an "extraordinary remedy" and should only be granted if the plaintiffs have "clearly carried the burden of persuasion' on all four requirements." *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003).

## A. Liklihood of Success on the Merits

Plaintiffs allege their detention in Hutto is an abuse of discretion because Hutto is not a "licensed program" within the meaning of the *Flores* Settlement and Defendants have given no reason for their decision to place Plaintiffs in a secure facility.[4]  Plaintiffs further allege the Hutto facility is not in compliance with the standards set forth in Exhibit 1 of the *Flores* Settlement. Plaintiffs are highly likely to prevail on both claims.

---

[4] Plaintiffs contend the standard of review regarding ICE's placement decision should be de novo because ICE did not give Plaintiffs any notice of the reason for its decision to place them in a non-licensed program. *See Flores* Settlement ¶24(C).  The Court is unpersuaded by this argument.  ICE's placement decision is reviewed for abuse of discretion. *Id.*  ICE's failure to provide a reason for its decision is a factor to be weighed in determining whether ICE abused its discretion, but does not change the standard of review.

**i.  Hutto is not a "licensed facility" and Defendants have abused their discretion in placing Plaintiffs there.**

In order to qualify as a "licensed program" under the *Flores* Settlement, Hutto must meet three requirements.  The facility must be (1) licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children,  (2) "non-secure as required by State law," and (3) in compliance with the standards of medical care, education, supervision, and nutrition described in Exhibit 1 of the *Flores* Settlement.  *Flores* Settlement ¶6.

Defendants argue Hutto is a "licensed program" because it has obtained a valid licensing exemption from the State of Texas.  Plaintiffs respond that Defendants obtained their exemption by misrepresenting the extent to which parents in detention would be able to make decisions regarding the care of their children.  The Hutto facility is exempted as a "program of limited duration" with "parents on the premises" under 40 Tex. Admin. Code § 745.117(2).  The criteria listed for this exemption are:

> a.  The program operates in association with a shopping center, business, religious organization, or establishment;
> b.  The parent or person responsible for the child attends or engages in some activity nearby;
> c.  The children are cared for during short periods. A child may only be in care when the parent or person responsible for the child attends or engages in the nearby activity;
> d.  The parent or person responsible for the child can be contacted at all times.

*Id.*  Apparently, the exemption was granted on the premise that the only "child care" offered by Hutto personnel would be during the educational hours and that parents would accompany their children at all times. The Court questions whether this is a reasonable characterization of the Hutto operation. From the testimony at the hearing and the affidavits presented to the Court, it seems clear that

--

12

the facility and the officers exercise a high level of control over virtually every aspect of the families' functioning, including things like what time they get up in the morning, what time they shower, what time they eat, when their meal stops, where they go, whether they have access to a game or a toy. That really in every important respect— in every important aspect of the family's functioning throughout the day that it's the facility, it's the officers who administer the rules there that retain control.

March 20, 2007 Hearing Testimony of Dr. Andrew Clark. Moreover, Plaintiffs have been in the control and custody of Hutto personnel twenty-four hours a day, seven days a week, over a period of several months each. This situation stands in sharp contrast to the description of a "program of limited duration" offered by 40 TEX. ADMIN. CODE § 745.117(2). The statute characterizes this exemption as one for "occasional short term care" and lists Sunday school classes (typically held once a week for at most two hours) as an example. *Id.* The statute specifically excludes ongoing care programs like employee or student day care operations, stating that they do not represent the type of "occasional short term" arrangement contemplated by this exemption. *Id.*

The power of a federal district court to review the licensing decisions of the State of Texas is, however, quite limited. *See, e.g. G.J. Deasy Invest., Inc. v. Mattox*, 778 F.2d 1091, 1092 (5th Cir. 1985) ("'The Due Process Clause does not authorize this court to assess the wisdom of the [State] Legislature's [licensing] decision.'") (quoting *Rice v. Norman Williams Co.*, 458 U.S. 654 (1982)). The Court is pleased to note the State is currently reviewing Hutto's licensing exemption in light of policy changes at the facility, but the Court is without power to instruct the state on compliance with its own licensing requirements.

Plaintiffs argue the licensing exemption, while it may bring Hutto in compliance with state law, is insufficient to satisfy the requirements of the *Flores* Settlement, which is a separate source of legal obligation and which does not contemplate exemptions. Defendants respond that the

13

exemption satisfies the spirit of the Settlement because no affirmative license is available— Texas only grants licenses regarding the care of children unaccompanied by their parents, not family groups. Plaintiffs point out that Texas does in fact provide licensing for residential child care to emergency shelters and other organizations offering residential care to both adults and children. *See* TEX. ADMIN. CODE §748.1901 *et seq.* ("The rules in this subchapter apply to operations that provide care for both children and adults.").

Plaintiffs further argue that, if an affirmative license is truly unavailable, Defendants should have brought this "impossibility" to the attention of the *Flores* court and sought a clarification or modification of the Settlement allowing them to operate under an exemption rather than a license. The Court finds it inexplicable that Defendants have spent untold amounts of time, effort, and taxpayer dollars to establish the Hutto family detention program, knowing all the while that *Flores* is still in effect, without either promulgating final regulations or going back to the *Flores* court for clarification and/or modification of the requirements of the consent decree in the family detention context. Nevertheless, the fact is that Defendants have not sought any such clarification or modification and clearly have no intent to do so.

While, as discussed above, this Court is without power to dictate under which provision of the Texas Administrative Code the Hutto facility should have been considered for licensing, the Court is convinced that the State's decision to grant a licensing exemption does not discharge Hutto's obligations under the *Flores* Settlement. The Settlement Agreement is, in essence, a Court-approved contract binding on ICE and DHS. *See, e.g. United States v. ITT Continental Baking Co.*, 420 U.S. 223, 237 (1975). It is also a court order directing the parties to comply with its terms. *Id.* at n.10. The terms of the *Flores* Settlement direct Defendants to house child detainees in facilities

14

that are state licensed to provide residential care to minors. A state license is qualitatively different from a state license exemption. A state license subjects the facility to periodic health and safety evaluations by an outside regulatory body, while a state licensing exemption, by its very nature, removes that layer of oversight.

Comparing Hutto's interaction with Texas regulators with the experience of the Berks facility, the only other "Family Detention Center" in the country, is instructive in this regard. The Berks facility, like Hutto, was initially informed that the State of Pennsylvania did not have licensing requirements for family residential care. Women's Commission Report 36. Berks, however, requested that Pennsylvania apply the standards generally applicable to child residential and day treatment facilities to "create a box to check," as Berks personnel felt the facility could not operate without an affirmative license of some kind. *Id.* The State agreed, and Berks has since been subject to annual review for compliance with all state regulations governing child residential and day treatment facilities, including regulation of physical accommodations, equipment, staff qualifications and training, child health and safety assessments, and the nutrition and health care afforded children in its custody. *See generally* 55 PA. CODE §§ 3800.1 *et seq*; see also Pl's Resp. to Supp. Br. Ex. GG, Attachment 1.

In contrast, the Hutto facility has not been subject to any state regulation at all regarding its treatment of the children in its care. As a result, the undisputed testimony is that for at least the first seven months of its existence the Hutto facility offered children in its care only one hour of education per day. The undisputed testimony is that, until recently, children in the care of the Hutto facility were allotted twenty minutes or less to eat their meals and were not afforded any other nutrition

during the day.  Hutto is admittedly making changes to improve the quality of life for its detainees, but as Plaintiffs pointed out at the hearing, many of these changes were coincidentally made at or around the time of the Texas Civil Rights Project ("TCRP")'s highly publicized challenge to Hutto's policies.  TCRP was given a tour of the facility immediately after Hutto added several thousand dollars' worth of improvements to the physical plant and the recreational equipment.  As the Court noted in the March 20, 2007 hearing, "a whole lot of things appeared right before the tour, including gym mats . . . . I suspect a lot of that would have taken place if there was an application for a license from the state of Texas on having children.  I think, very promptly, those changes would have been totally made because it would be unacceptable to anybody issuing a license for children to live there."

The Court finds the state licensing requirement is a substantive protection for which the *Flores* parties bargained, and ICE cannot unilaterally avoid that material contract term by choosing to seek license exemptions for its child detention facilities.  *See, e.g. Police Ass'n ex rel. Cannatella v. City of New Orleans*, 100 F.3d 1159, 1173 (5th Cir. 1996) (a local ordinance permitting conduct that is prohibited in a consent decree does not excuse defendants from complying with the terms of the consent decree).  If it is, in fact, impossible for ICE to obtain a license from the state of Texas to provide "residential, group, or foster care services for dependent children" in a family detention setting, *Flores* Settlement ¶ 6, the proper course of action is to apply to the *Flores* court for a modification of this requirement.  *Police Ass'n*, 100 F.3d at 1171.

Even if the licensing exemption were enough to satisfy the state licensing requirement of the *Flores* Settlement, the evidence presented at the hearing strongly suggests Hutto does meet the other

two prongs of the definition of a "licensed program" under *Flores*. A "licensed program" must be "non-secure as required by state law" and must operate in compliance with the standards set forth in Exhibit 1 of the *Flores* Settlement. *Flores* Settlement ¶ 6.

The evidence presented at the hearing and by affidavit is that the Hutto facility is run in many respects as a "secure facility." The Texas Family Code describes a "secure detention facility" as "any public or private residential facility . . . that (A) includes construction fixtures designed to physically restrict the movements and activities of juveniles or other individuals held in lawful custody in the facility, and (B) is used for the temporary placement of any juvenile who is accused of having committed an offense, any nonoffender, or any other individual accused of having committed a criminal offense." TEX. FAM. CODE § 51.02 (13) and (14). The Hutto facility houses juvenile nonoffenders and includes construction features such as an outer perimeter fence that was topped with razor wire until recently. March 20, 2007 HearingTestimony of Simona Colon. Furthermore, the movements of the Hutto detainees are restricted in that they are required to be escorted everywhere by Hutto personnel (although a limited "hall pass" program is being implemented to give detainees the right to walk to medical and law library areas unaccompanied). Testimony of Simona Colon. The detainees are confined to the common area in their "pod" (formerly "cell block") except during sleeping hours, meal times, and scheduled education and recreation times. Testimony of Dr. Clark; Women's Commission Report 16. The Hutto detainees are forced to stand still for "head counts" several times a day. Testimony of Simona Colon. The lights in each "dorm room" stay on all night (just as they did when the "dorm rooms" were "prison cells"). Declaration of Kevin Yourdkhani (age 9), Mot. Prel. Inj. Ex. J; Decalaration of Deka

--

17

Warsame (mother of Mohammed Ibrahim), Mot. Prel. Inj. Ex. M.  The dorm room doors are monitored by laser sensors that are tripped when the door opens more than four inches.  Women's Commission Report 17.  In short, Hutto has been operated to date as a "secure" facility under Texas law.

The evidence presented at the hearing and by affidavit also shows that the Hutto facility is not being operated in compliance with the standards of *Flores* Exhibit 1.  As compliance with Exhibit 1 provides an independent ground for relief, this issue will be discussed more fully below.  For now, it suffices to say that the Hutto facility is simply not a "licensed program" within the meaning of the Flores Settlement, because it is neither (1) licensed by the State of Texas, (2) "non-secure" under Texas law, or (3) in compliance with Exhibit 1.  *Flores* Settlement ¶ 6.

Defendants have no discretion under the terms of the *Flores* Settlement to place a child in a non-licensed program unless the minor (1) has been charged or "is chargeable" with a crime or delinquency other than an isolated or petty offense, (2) has committed or threatened violence to himself or others while in INS custody, (3) has engaged in disruptive conduct like drug abuse, stealing, or intimidation of other children while in a licensed program, (4) is an escape risk or (5) would be in danger unless kept in a secure facility.  *Flores* settlement ¶ 21.  Even a minor who fits these criteria "will not"be placed in a secure facility under Paragraph 21 if there are less restrictive options available such as a medium security facility or licensed program.  *Flores* settlement ¶ 23. Because Defendants have never made any individualized finding that any of the minor Plaintiffs falls into one of the categories described in Paragraph 21 of the *Flores* Settlement, Plaintiffs are likely to prevail on their claim that Defendants have abused their discretion by placing Plaintiffs in Hutto,

--

a non-licensed program.

**ii.  Hutto is not in compliance with Exhibit 1 of the *Flores* Settlement**

Plaintiffs are equally likely to prevail on their independent claim that the Hutto facility is not

being operated in compliance with Exhibit 1 of the *Flores* Settlement. A facility's efforts to comply

with Exhibit 1 are reviewed de novo. Exhibit 1 is written in broad terms and covers many aspects

of the detention process. The evidence introduced at the preliminary injunction hearing and through

affidavits highlights a few key respects in which Hutto is likely failing to satisfy the standards of

Exhibit 1. The Court's discussion below is not exhaustive, and the Court makes no definitive

findings regarding the Hutto facility's compliance or failure to comply. A full evidentiary hearing

on the subject of Hutto's compliance is necessary to make a final determination on Plaintiffs' claims.

Nevertheless, the record established to date  shows that Plaintiffs are substantially likely to prevail

on their challenge to the Hutto facility's compliance with *Flores* Exhibit 1.

**1)  Exhibit 1(A)(1) requires "proper" physical care, including "suitable" living accommodations, food, appropriate clothing, and personal grooming items**

The testimony presented at the hearing and in the affidavits establishes that living

accomodations and food, in particular, may well be "unsuitable" at Hutto. "The food is very bad and

no one can eat it, everyone throws it out. . . [My son] Kevin has lost 4 pounds in 10 days."

Declaration of Masomeh Alibegi (mother of Kevin Yourdkhani), Mot. Prel. Inj. Ex. I. "The food

is garbage. . . . Before we got commissary money, I was hungry all the time for five days."

Declaration of Kevin Yourdkhani (age 9), Mot. Prel. Inj. Ex. J. "None of my children will eat the

food that is served in the cafeteria . . . it makes their stomachs hurt so they won't eat it. Mohammed

--

has thrown up." Declaration of Deka Warsame (mother of Mohammed Ibrahim), Mot. Prel. Inj. Ex. M. "I don't like the food in here. It makes my stomach feel bad, sometimes cold sometimes greesy [sic] most of the time." Declaration of Bahja Ibrahim (age 9), Mot. Prel. Inj. Ex. O. Plaintiffs' expert, Dr. Clark, testified that the children he interviewed had lost significant weight during their time at Hutto, which is unusual in a growing child. The declaration of Marc Moore, however, states that each Plaintiff's medical records show stable weight or minor weight gain during the children's stay at Hutto. Declaration of Marc Moore, Supplement to Def.'s Reply to Equitable Remedies.

At the hearing, Simona Colon testified that she has made arrangements for detainees to have access to refrigerators with snack food in the dorm areas, but it is unclear whether this has actually increased the children's access to healthy nutrition. In particular, it is unclear whether the refrigerators, which Colon testified are full of fruit and milk, are replacements for, additions to, or the same thing as the "commissary" mentioned in the detainees' declarations. "The children eat the food from the commissary, only chips and chocolate cookies and honey bars and cupcakes and apple juice are for sale there." Declaration of Deka Warsame. "Now I can eat chips, cookies, and chocolate milk [from the commissary]." Declaration of Kevin Yourdkhani.

The living conditions at Hutto seem questionable in general. For example, the testimony of Simona Colon established that there is no privacy barrier separating toilets from the rest of each family's living area, though the facility has recently designated two cells in each pod as bathrooms to remedy this issue. The declaration of Rasa Bunikeine, mother of Plaintiffs Saule Bunikyte and Egle Baubonyte, states that "Only 30 minutes is allowed for all the children in the pod to take a shower . . . .. One night when there were 28 kids in the pod, there were only three showers working,

two had only very cold water and we could not use them." Mot. Prel. Inj. Ex. G. Nevertheless, Bunikeine states, "Officer Ramos said 'Only one minute per child in the shower.'" *Id.* The Declaration of Elsa Carbajal, mother of Richard Tome Carbajal and Angelina Tome Carbajal, states that "Here they only give us twenty minutes to eat . . . . And if the children have not finished eating, they tell us to throw away the food and get going. In some cases they have grabbed the food and thrown it in the trash in front of the children." Mot. Prel. Inj. Ex. P. Several detainees also stated that, during the colder months, they were not allowed enough clothing to stay warm. Declarations of Elsa Carbajal, Deka Warsame. Detainees complain that the clothing provided is often dirty or stained and smells bad. Declarations of Deka Warsame, Bahja Ibrahim; Declaration of Aisha Ibrahim (age 11), Mot. Prel. Inj. Ex. N.

## 2) Exhibit 1(A)(2) requires "appropriate routine medical and dental care"

Exhibit 1 does not define "appropriate" medical care, but the testimony and affidavits before this Court raise doubt that Hutto is providing it. At the hearing, ICE representative Commander Hochberg testified there is sick call seven days a week, with "pick-up" every single day. Pick-up residents are seen within 24 hours. However, Commander Hochberg also testified that the medical staff at this facility (which is responsible for the medical treatment of over 400 detainees, approximately half of whom are children) consists of exactly *one* licensed physician available on-site exactly 8 hours per week, one dentist, four nurse practicioners, and six nurses. There is no pediatrician on staff. *Id.* There are two mental health providers, neither of whom is a board-certified psychologist (one is a "masters' level social worker" and the other is "master's level psychologist.") *Id.* One licensed psychiatrist is available by phone. *Id.* There are no interpreters on the medical

--

21

staff, though the staff have access to electronic interpreters. *Id.* Detainee Masomeh Alibegi states

"Often at the facility they run out of [medical] supplies and several requests must be made before

they get the medicine. . . . Everyone in the pod is really sick. My kids have eye infections and I have

seen the nurses using the same dropper to give kids eye drops over and over again and not cleaning

it."

**3) Exhibit 1(A)(3) requires the facility to make an individualized needs assessment for each child.**

Facility Director Simona Colon testified that this assessment process is simply not being

conducted. She gave no explanation for this failure, but stated that the facility is currently "looking

at three-prong assessments to meet [the requirements of *Flores*]." The declaration of Mark Moore,

however, states that Hutto's existing intake policy satisfies this requirement. Declaration of Marc

Moore, Def.'s Suppl. Reply to Equitable Remedies. The Court is unconvinced. Hutto's intake

assessment appears to identify the broad physical and mental health needs of each detainee, but does

not establish any details regarding the minor's "educational assessment and plan," "family

relationships and interaction with adults, peers, and authority figures," or "personal goals, strengths,

and weaknesses." *Flores* Ex. 1(A)(3). Moreover, these detailed assessments are supposed to be

conducted *in addition to* "various initial intake forms." *Id.*

**4) Exhibit 1(A)(4) requires the facility to provide educational services "appropriate to the minor's level of development" in a "structured classroom setting, Monday through Friday" that should include "Science, Social Studies, Math, Reading, Writing, and Physical Education" and focus secondarily on English Language Training**

--

The detainees assert the level of education at Hutto is "absolutely inappropriate." Declaration of Rasa Bunikiene. "The teacher only gives out packets of work but does not explain anything." Declaration of Egle Baubonyte (age 15). "They put me in grade 4, but they won't help me learn. . . . I like math but no one will help me, they are always learning ABCs and it is too easy. . . . The teacher doesn't have time to talk to me." Declaration of Kevin Yourdkhani (age 9). "Children in high school are doing elementary work." Declaration of Pamela Puran (mother of Wesleyann Emptage), Mot. Prel. Inj. Ex. L.

At the hearing, Simona Colon admitted the Hutto detainees were receiving only one hour of education services per day when she arrived in November of 2006, but states:

> So beginning of January, they started receiving four hours core curriculum classes, one hour of recreation, and one hour of lunch. We included, shortly afterwards, another hour of extracurricular activity, which could include either computer, arts, crafts, music. So now, the children are receiving, you know, from kindergarten to twelfth grade, five hours of classroom time, one hour of recreation, and one hour of lunch. So they're receiving a total of seven hours.

Colon asserts the educational services being provided now are in compliance with Texas state requirements. However, the court notes that the declarations of Egle Baubonyte and Kevin Yourdkhani, both expressing dissatisfaction with the substance of the educational programs, were executed on March 1, 2007, well after the changes Colon describes were made.

**5) Exhibit 1(A)(5) requires at least one hour per day of large muscle activity and one hour of structured leisure time activity (outdoors weather permitting)**

This is one of the few areas about which the detainees had little complaint. Simona Colon testified that Hutto has recently significantly upgraded both recreation equipment and policies,

upgrading toys in the dorms and gymnasium and adding an extra hour of rec time to the detainees' schedule.  Residents have access to basketball, soccer, volleyball, ping pong, video games, exercise videos, and craft supplies during recreation times.

**6) Exhibit 1(A)(6) requires "at least one individual counseling session per week conducted by trained social work staff."**

The testimony of Simona Colon is: "Currently, we're not conducting the individual counseling."  Colon's testimony did not explain why this express requirement of the *Flores* settlement is not being met.  The declaration of Marc Moore states that Hutto's psychological services are available on request and that this weekly counseling requirement is not applicable to a family detention setting because the children's parents are available. Def.'s Suppl. Reply to Equitable Remedies.  The Court notes, however, that many of the parents of the minor Plaintiffs in these related cases are experiencing psychological trauma of their own, having fled serious persecution (including torture and rape in some cases) in their home countries.  There is no reason to assume their children are less in need of counseling while in the custody of the United States than any other minor suffering similar upheaval.  In short, there is no reason to assume the parties intended to limit the clearly-worded requirement of the *Flores* Settlement that all minors in United States immigration custody receive "[a]t least one individual counseling session per week conducted by trained social work staff" to unaccompanied minors.  *Flores* Exhibit 1(A)(6).

**7) Exhibit 1(A)(7) requires "group counseling sessions at least twice a week."**

The testimony of Simona Colon is that group counseling began in March of 2007 and is conducted by by CCA case managers and facility program managers.  "What they're conducting is they'll put the dorms together with the employees that work in that dorm who have established

24

relationships, kind of like we perform our meetings, and they have an open forum." *Id.* This procedure seems to satisfy the Exhibit 1 requirement, but Colon offered no explanation for why Hutto took ten months to comply with this relatively clear-cut directive.

**8) Exhibit 1(A)(9) requires the facility to provide a "comprehensive orientation" to detainees.**

The testimony of Simona Colon is that the handbook given residents at orientation is incorrect with regard to numerous rules and regulations. Though the declaration of Marc Moore is that detainees receive a comprehensive orientation including translation services, Def.'s Reply to Equitable Remedies, the Court is concerned by the stated inaccuracies in the orientation handbook.

**9) Exhibit 1(A)(11) requires that a facility allow detainees visitation *and contact* with family members.**

The testimony of Simona Colon is that no contact visits were allowed until March 2007, but that this policy was recently changed.

**10) Exhibit 1(A)(12) guarantees detainees a reasonable right to privacy: to the extent "permitted by house rules" detainees should be able to wear their own clothes, have a private space for their personal belongings, be allowed private phone time and private visitation, and receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.**

The extent to which Exhibit 1 guarantees *specific* privacy rights is unclear because of the limiting language accompanying this section: residents may wear their own clothes "when available" and have private phone and visitation time "as permitted by house rules and regulations." *Flores* Exhibit 1(A)(12). Nonetheless, the extent to which Hutto's regulations curtail detainees' privacy

rights may invade Exhibit 1's "reasonable right to privacy" guarantee.  For example, Hutto residents were not allowed to wear their own clothes at all until recently. Simona Colon's testimony is that Hutto has changed this policy so that, beginning March 3, 2007 children under 5 are allowed to keep 3 sets of clothing. Hutto plans to extend this privilege to another age group every 30 days.  The testimony of Simona Colon is that no jewelry is allowed at Hutto.

With regard to a "private space for personal belongings," Colon testifies that detainees may keep toys and hang the childrens' artwork in their rooms, but the handbook provided to the detainees at orientation states that no toys may be kept in the rooms and nothing may be hung on the walls. Colon testifies that detainees are not allowed to receive books from family members; the books must be mailed directly from the publisher.

Privacy in other important areas is restricted.  The testimony of Commander Hochberg is that there are no private areas to consult with mental health professionals; consultations happen in the dorms or in the clinical area.  The testimony of Simona Colon is that at the time of the hearing there were no private toilets for detainees; each dorm room contains an open toilet.  Colon testified the facility plans to change this by setting aside cells that will be used as "restrooms" in each dorm area beginning the Monday after the hearing.

Colon further testified that there are no private attorney-client conference rooms; attorneys use one community visitation room and one community classroom to speak with their clients.  The testimony of Griselda Ponce is that her clients have expressed embarrassment during their "credible fear" interviews because other detainees are able to hear the details of their answers to the asylum officer's questions, which often involve personally embarrassing or terrifying experiences. Simona

Colon's testimony establishes that, until the day of the March 20, 2007 hearing, not only were detainees required to consult with their lawyers in the presence of guards, children, other detainees, and whomever may have happened to be in the public area where attorney visitation took place, but they were also required to discuss their cases (including traumatic past events such as rape and torture in the case of asylum seekers) in the direct presence of their minor children.

Furthermore, until the day of the March 20, 2007 evidentiary hearing, neither Plaintiffs, their parents, their counsel, nor their duly authorized medical experts were allowed access to the Plaintiffs' *own* medical records. Defendants offered no reasonable explanation for this phenomenon, probably because support for such a policy is virtually unknown in Anglo-American jurisprudence.[5] Compounding this injury to Plaintiffs' privacy rights, Defendants recently proceeded to enter these top-secret medical records, as well as the medical records of Plaintiffs' mothers, as *unsealed* exhibits in this case— without the permission of any party.[6]

Hutto also has regulations restricting residents' movement in ways that may be an unreasonable limitation on privacy, though Colon testified there have been recent policy changes in this area. Residents used to be escorted everywhere by guards, but "we have implemented a pass program where they are allowed to go from their dorm areas to medical. Now they'll be allowed to go to the legal area for visitation, regular visitation, where they'll be allowed to go to recreation so that it's not a controlled movement." Testimony of Simona Colon. The residents are also "counted"

---

[5] Defendants represent that this particular policy ended on the day of the evidentiary hearing. The Court certainly expects so.

[6] The Court has, of course, sealed these records.

four times a day (down from seven counts a day prior to March 2007).  Colon testifies that counts are conducted as follows: "The contractor would stop movement, and if anyone was in the dorm area, they were placed in the bedroom area as they conducted the count.  The others, if they were in recreation, they just used the box with all the Ids. . . . That has since changed. . . . now, they don't move the residents to the bedroom area.  They just stop movement and conduct their counts."

**11) Exhibit 1(C) guarantees that "Minors shall not be subjected to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living, such as eating or sleeping."**

The testimony of the detainees is perhaps most troubling in this regard.  Many declarants state that Hutto guards have threatened to separate them from their families as a means of disciplining them for minor infractions of Hutto rules.  "When the police [guard] came and saw my dad in my room, he sad if he comes again and sees my dad in my room he's going to put my mom in a separate jail and my dad in a separate jail and me in a foster home."  Declaration of Kevin Yourdkhani.  "When I was at recreation, a Hatian woman called Cheli Rose told me that one of the officials . . . . said that she'd be placed in another cell away from her child [if she continued to cry]."  Declaration of Sherona Verdieu.  "Wesleyann has heard the guards threaten that children who act up will be separated from their parents."  Declaration of Pamela Puran.  "[T]he case manager, Miss Parks, came to me and said . . . . I can have one chance but if the children don't behave first we will be separated into different pods and then if they still don't behave ICE will take them to another place."  Declaration of Deka Warsame.  "When my sister Bahja got in trouble and the guards said they were going to separate my family I got so mad at Bahja and I was scared."  Declaration of Aisha

Ibrahim. "If you don't be good you can or will be separated from your mom." Declaration of Bahja

Ibrahim. Threatening to separate very young children from their families for minor rules infractions

is a disciplinary tactic that is certainly inappropriate and which may well constitute mental abuse.

**iii. Plaintiffs have not shown they are entitled to the release of their parents based on the**

***Flores* settlement.**

The Court acknowledges the testimony of Simona Colon that the Hutto facility is a work in

progress and is continually updating and improving its policies, but the testimony and evidence in

the record thus far suggests Plaintiffs are highly likely to prevail on their claims that the Hutto

facility is not being operated in compliance with many, if not most, of the standards outlined in

Exhibit 1 of the *Flores* Settlement. There is more than one element to "likelihood of success on the

merits," however. Plaintiffs have established a high likelihood of success on the merits of their

claims, but they have not established that they are entitled to the specific relief they seek. In

particular, Plaintiffs seek immediate release from Hutto *with their parents* as a remedy for

Defendants' alleged *Flores* violations. The *Flores* settlement, however, does not provide any

particular rights or remedies for adult detainees.

The *Flores* Settlement was drafted in response to the complaint of a group of *unaccompanied*

minor aliens. Its provisions, though applicable to minors detained with their families, do not

specifically contemplate family detention. Though family unification is a stated goal of both the

Flores Settlement and US immigration policy generally, nothing in the settlement agreement

expresses a preference for releasing parents who have violated immigration laws. In fact, the context

of the *Flores* Settlement argues against this result: the Settlement was the product of litigation in

which unaccompanied minors argued that release to adults other than their parents was preferable

to remaining in custody until their parents could come get them. *See Reno v. Flores*, 507 U.S. 292

(1993). The Flores Settlement deals with the rights of minor aliens in detention, not with the rights

of detained parents.

Though each Plaintiff's surviving parents are in detention with them, it appears possible for

ICE to comply fully with the settlement terms by releasing the children to adult relatives not in

custody, adult friends designated by their parents, or even state-operated foster care. *See Flores*

Settlement ¶14. Plaintiffs have not identified any authority in the Settlement language or in

applicable case law, statutes, or agency rules that would prevent such a release. However, such a

release is not mandated by the *Flores* Settlement language. Paragraph 14 states that detention of a

minor may be "required . . . to ensure the minor's safety." Both Plaintiffs and Defendants recognize

that keeping the minor Plaintiffs with their parents is in their best interests, and release of the minor

Plaintiffs without their parents would not be beneficial. Therefore, Plaintiffs do not seek release to

another adult; they seek release from Hutto only if they can be released simultaneously with their

parents.[7]

Neither *Flores* nor any federal rule or statute mandates the simultaneous release of parents

and children from detention. Though there are no federal rules governing standards for detention

of minors in family groups, the federal rule on release of minor aliens provides that if a detained

---

[7] The Court notes Plaintiffs Egle Baubonyte and Saule Bunikyte are currently seeking parole to
their respective stepfathers without the simultaneous parole of their mother, Rasa Bunikeine.
Their application for a preliminary injunction before this court, however, appears to remain an
application for the simultaneous release of the whole family.

minor has identified a parent who is also in detention, simultaneous release of the juvenile and the adult shall be considered on a case-by-case basis *if* no parent, legal guardian, or adult relative can be found who is not also in detention. 8 C.F.R. 236.3 (emphasis added). This rule does not require simultaneous release and indeed appears to prefer release to an adult relative not in custody over simultaneous release of parent and child. *Id.*

It therefore appears that nothing in this rule or in the terms of the *Flores* settlement would prevent release of the children to an adult relative not in ICE custody. This illustrates the fact that the *Flores* Settlement gives the minor Plaintiffs enforceable rights, but does not create rights in the parents separate from their children's rights. Plaintiffs do not raise any constitutional or statutory claims; they rely only on the *Flores* settlement. As *Flores* creates no rights in the parents of detained minors, Plaintiffs have not established any basis for releasing the parents of the minor Plaintiffs.

Plaintiffs emphatically do not seek release of the minor Plaintiffs without their parents, but there appears to be no basis for a preliminary injunction ordering release of the Plaintiffs with their parents on these grounds. Though the Court certainly has the power to enforce Plaintiffs' rights under the *Flores* consent decree by entering an order broader than the terms of the decree itself, the Court is not convinced that Plaintiffs' parents are entitled to obtain release based on their children's rights under *Flores*.

## B. Irreparable injury

The Court is also unconvinced that Plaintiffs have established irreparable injury, though Defendant's alleged conduct is certainly unjustifiable. As a threshold matter, the Court notes Plaintiffs can claim no irreparable injury from the fact of their detention. The detentions themselves

are entirely lawful. Plaintiffs can challenge only the conditions of detention.

Plaintiffs allege the stressful conditions of detention are causing them irreparable injury. Plaintiffs' expert witness, Dr. Andrew Clark, opined that the majority of the minor Plaintiffs are suffering from depression and/or post-traumatic stress disorder ("PTSD"). The Court, however, does not find Dr. Clark's diagnosis of PTSD credible. He interviewed ex-detainees for less than an hour each and describes symptoms of stress that, while serious, do not rise to the level of PTSD. As the expert witness for the defense, Dr. Gustavo Cadavid, testified, "Considering that this is a detention center, it's not a country club, it's a tough situation. There [are] stressors there; that's undeniable. But from there to say that everybody, regardless, has PTSD or has a huge stress, I think that's a leap. It's a big leap."

Dr. Clark does credibly describe stress-related symptoms such as nightmares, bed wetting, aggressive and regressive behavior among children released from Hutto. However, each of the four released families he interviewed told Dr. Clark that these behaviors have improved as the child continues daily life away from Hutto. For example, according to Dr. Clark, nine year old Neixcary Burgos says memories of her detention give her difficulty concentrating one month after her release, but twelve year old Reina Garcia no longer experiences nightmares or "any symptoms" and is doing well in school after two to three months away from the facility, though talking about Hutto still makes Reina cry. March 20, 2007 Hearing Testimony of Dr. Andrew Clark.

Another aspect of "irreparable" injury is that Plaintiffs must have no adequate remedy at law that is as complete and effective as the equitable relief they seek. The equitable remedy Plaintiffs seek is release from Hutto with their parents. As discussed above, the Court is not convinced that

the *Flores* settlement can be read to establish any rights or remedies for adult relatives of detained minors. There are several legal avenues available to Plaintiffs, however, that can provide exactly this relief. In particular, bond, parole, and habeas corpus proceedings can all result in the release of the Plaintiff families.

**a. Sherona Verdieu's legal remedies:**

A hearing before an immigration judge regarding the Verdieu family's asylum petition is scheduled for April 25, 2007. The Verdieus are not eligible for release on bond until the hearing, because they are classified as "arriving aliens." Under 8 C.F.R. § 1003.19(h)(2)(i)(B), immigration judges are without jurisdiction to review ICE's custody determinations for "arriving aliens in removal proceedings."

The Verdieus are eligible for parole: they are asylum seekers who have passed a credible fear screen; they have a relative in Miami, Florida who is a US citizen and is willing to support them and ensure their compliance with immigration proceedings; and their identities are not in question. The Verdieu family has submitted two requests for parole to ICE Field Office Director Mark Moore. Their October 3, 2006 request was denied without explanation on November 7, 2006. Their March 16, 2007 request has also been denied. The Verdieu family has not made any habeas corpus challenge to the detention or to the denial of their requests for parole.

**b. Egle Baubonyte and Saule Bunikyte's legal remedies**

A hearing before an immigration judge is scheduled for April 26, 2007 in Chicago, Illinois. The girls' mother, Rasa Bunikiene, is worried that the girls will be separated from her during these proceedings unless the family is released from custody, because there is no family detention center

in Illinois. Bunikiene alleges she told her attorney to apply for asylum, but the attorney never filed the asylum application. The hearing is to determine whether the family, who were conditional permanent residents and whose residence is now being challenged, should be removed.

Though this family was eligible for release on bond, Bunikiene claims her immigration attorney has been ineffective and that the family's bond request was denied not on the merits but because the attorney did not properly file it. The attorney subsequently moved for a change of venue from San Antonio to Chicago, where the family lived prior to detention. The Chicago judge held that any custody redetermination should be made by the San Antonio judge who initially heard the bond request; the girls currently have requests for bond redetermination pending in San Antonio.

The family is eligible for release on parole: they were conditional permanent residents whose residence is being challenged. Bunikeine is married to a US citizen in Chicago; he is willing to support the family and ensure their compliance with immigration proceedings. Their identities are not in question. The attorney has filed I-751 waiver forms (Petitions to Remove to Conditions of Residence) on behalf of both girls, but no request for parole has been made on Bunikeine's behalf. The girls' requests are still pending. No habeas petition has been filed in this case.

## c. Effect of legal remedies

The Court notes that the existence of parole, bond, and habeas proceedings does not impact Plaintiffs' request for injunctive relief ordering ICE to comply with the *Flores* Settlement in detaining plaintiffs, because these procedures cannot fully address the plaintiffs' conditions of detention. Neither Plaintiffs nor Defendants have identified any avenue other than a lawsuit based on the Flores Settlement for challenging the conditions of detention at Hutto. However, the

preliminary relief Plaintiffs seek is *release* from Hutto with their parents, which is exactly the relief that bond, parole, and habeas proceedings are designed to provide.

Plaintiffs argue these remedies are not as "complete, practical, and efficient" as injunctive relief under *Flores* would be.  *See Terrace v. Thompson*, 263 U.S. 197, 214 (U.S. 1923).  In particular, they argue the standard for habeas relief will be stricter than the standard for release under *Flores*.  Habeas courts generally uphold the government's custody decisions so long as the government can present a "facially legitimate and bona fide reason" for the denial of parole, whereas Plaintiffs believe *Flores* expresses a preference for supervised release.  Plaintiffs also argue that the timetable for decisions on parole and habeas applications is indefinite, while they believe *Flores* requires their *immediate* release.

Plaintiffs cite *McCarthy v. Madigan* 503 US 140, 147 (1992) for the proposition that a plaintiff may not be required to exhaust administrative remedies where the uncertain timetable for administrative review could be prejudicial.  However, unlike the plaintiff in *McCarthy*, Plaintiffs in this case have not shown that the time it takes to process a parole or habeas claim would be "futile" or would jeopardize their claim for relief.  *Id.*  Plaintiffs allege Defendant Marc Moore has made a practice of denying parole claims from Hutto detainees without explanation and without regard to factors that would normally point towards eligibility for parole.  As the Court announced at the March 20, 2007 hearing, it is therefore ORDERED that Moore shall be present for all future hearings unless excused.  Nevertheless, Plaintiffs have not shown that they are without meaningful access to legal remedies.  Though the Verdieu family has been denied parole twice, a successful habeas challenge would grant Sherona Verdieu the exact relief she seeks here— release with her family.

Even without a successful habeas petition, Sherona's asylum hearing on April 25, 2007 may well achieve her release from Hutto with her family.  The existence of these multiple avenues for legal review of the detention undermines Plaintiffs' claims of irreparable injury.

Plaintiffs claim irreparable injury from the fact of the detention itself, but the detention is lawful. The conditions of the detention probably violate the *Flores* settlement, but Plaintiff's expert failed to establish ongoing or irreversible injury from the conditions of ex-detainees, and the testimony of Simona Colon is that conditions at Hutto are significantly improving.

## C.  Balance of Harms

Plaintiffs have certainly established serious problems with conditions at Hutto, but these problems must be weighed against the alleged injuries Defendants would sustain if Plaintiffs were granted preliminary relief.  The Court notes that ordering the release of Plaintiffs with their parents based on Hutto's failure to meet the requirements of *Flores* would gravely undermine the entire family detention program.  Plaintiffs assert they are not challenging the legality of family detention generally; they are merely challenging family detention that is not *Flores*-compliant.  However, ordering the release of Plaintiffs with their parents as a remedy for Defendants' failures to comply with *Flores* would have the practical effect of invalidating the detention of every other family in Hutto, as well.  Hutto is the larger of only two family detention centers in the entire country.  A preliminary injunction ordering the release of these detainees would therefore effectively gut the family detention program nationwide.  Though the United States is not entitled to operate family detention centers without regard to its obligations under *Flores*, the Court is reluctant to enter an order essentially returning ICE to a policy of catch-and-release on the basis of a preliminary record.

**D.  Public Interest**

Plaintiffs assert Congress has expressed a preference for the supervised release of families, pointing to the ISAP program.   The language of the *Flores* settlement likewise expresses a preference for release.  However, both Congress and the *Flores* settlement  recognize the release of detained families is secondary to the strong public interest in ensuring that illegal immigrants appear for all necessary legal proceedings. Congress has delegated to DHS and ICE the authority to balance the public interest in family unification and supervised release against the public interest in enforcing immigration law.  Given the fact that as many as 39% of aliens issued a Notice to Appear by DHS never actually appear for immigration proceedings, the Court cannot say DHS has abused its mandate by exploring family detention. Def's Reply to Supplemental Briefing, Attachment. The public interest in enforcing immigration law would be ill served by a preliminary injunction ordering Plaintiffs' release with their parents.

**III.  Expedited Trial Schedule**

Though Plaintiffs are not entitled to a preliminary injunction ordering their release with their parents, the Court recognizes that their continued detention in substandard conditions is an urgent problem.  Furthermore, though Plaintiffs have exceeded the "average" stay in Hutto by quite a bit, the Court acknowledges that swift adjudication of this controversy is warranted to avoid a situation that is "capable of repetition, but evading review."  Accordingly, the Court asked the parties to prepare an expedited briefing and trial schedule for this case.

Defendants assert that November 2007 is the earliest they can be ready for trial.  Defendants assert it will take time to conduct discovery and draft dispositive motions in the many related but

unconsolidated cases. The Court is unconvinced. First, the number of Plaintiffs in the related cases decreases almost daily as Plaintiffs' immigration proceedings continue. There were ten related cases filed on March 6, 2007; as of April 9, 2007 there are three active cases remaining. Second, the three related cases are going to trial on issues that are substantially similar across the board; Defendants' compliance with *Flores* Exhibit 1 is an issue that will certainly be common to each related case. The burden of discovery is not so great that Defendants need nine months to prepare these cases for trial. Plaintiffs' suggested schedule, seeking docket call on July 16, 2007 is more reasonable, though the Court's schedule will not permit a trial in July. The related cases will, instead, go to trial in the month of August 2007.

### Conclusion

Accordingly,

IT IS ORDERED that Plaintiffs' Motion for Preliminary Injunction is GRANTED IN PART and DENIED IN PART. Defendants are ordered to allow Plaintiffs' counsel reasonable access to Plaintiffs, the Hutto facility, and Plaintiffs' records for purposes of discovery. Plaintiffs are not, however, entitled to release from Hutto with their families on the basis of the preliminary record.

IT IS FURTHER ORDERED that Defendant Marc Moore shall be present at all further hearings in the above-styled related cases unless previously excused by the Court.

IT IS ORDERED that the above-styled related cases are set for trial in the month of **August 2007.** In light of this trial setting, the parties are ordered to confer and present a proposed scheduling order regarding discovery and briefing in the related cases. In the event the parties cannot agree, each party is directed to submit a revised proposed scheduling order in light of the

August 2007 trial date now set.

SIGNED this the _9th_ day of April 2007.


_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE